BRIAN L. BLANKENSHIP, THOMAS J. DIMMOCK, AND FRANK D. JOHNSON v. GARY BARTLETT, AS EXECUTIVE DIRECTOR OF THE NORTH CAROLINA STATE BOARD OF ELECTIONS; ROY COOPER, AS ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA; AND NORTH CAROLINA STATE BOARD OF ELECTIONS

No. 455PA06-2

(Filed 28 August 2009)

## 1. Elections— judicial—districts—equal protection—intermediate scrutiny

A state constitutional equal protection challenge to Wake County Superior Court judicial election districts was remanded for further consideration where plaintiffs demonstrated gross disparity in voting power between similarly situated residents of Wake County. The Equal Protection clause of the North Carolina Constitution requires a degree of population proportionality in superior court districts and a heightened level of scrutiny is required, but the presence of a tension between elections and the judicial role means that the appropriate standard of review is between strict scrutiny and rational basis. Judicial districts will be sustained if the legislature's formulations advance important

government interests unrelated to vote dilution and do not weaken voter strength necessary to further those interests. If a violation of state equal protection is found, the trial court should defer initially to the General Assembly.

## 2. Evidence— public records—elections—Justice Department preclearance submissions—admissibility

The trial court did not err in a judicial elections case in its admission of Administrative Office of the Courts records concerning U.S. Justice Department preclearance. These records clearly fall within N.C.G.S. § 8C-1, Rule 803(8) as public records and there is no inherent error in admitting the evidence and then making findings based on the material the court considers trustworthy.

Justice TIMMONS-GOODSON dissenting.

Chief Justice PARKER and Justice HUDSON join in the dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 184 N.C. App. 327, 646 S.E.2d 584 (2007), reversing and vacating a judgment and order entered on 8 February 2006 by Judge Donald L. Smith in Superior Court, Wake County. Heard in the Supreme Court 23 February 2009.

*Akins/Hunt, P.C., by Donald G. Hunt, Jr., for plaintiff-appellants.*

*Roy Cooper, Attorney General, by Alexander McC. Peters, Special Deputy Attorney General, for defendant-appellees.*

BRADY, Justice.

Wake County voters are divided into four districts for purposes of exercising their constitutional right to elect superior court judges. However, the General Assembly gives residents in Superior Court District 10C approximately one-fifth, or only 20%, of the voting power of residents in Superior Court District 10A. Likewise, residents of Superior Court Districts 10B and 10D have approximately one-fourth, or 25% of the voting power of residents in Superior Court District 10A.

In this case we consider whether the Equal Protection Clause of the North Carolina Constitution applies to the General Assembly's

creation of an additional judgeship in Superior Court District 10A. We determine that the Equal Protection Clause applies to the legislature's actions and accordingly reverse the decision of the Court of Appeals and remand the case for further proceedings not inconsistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Both parties stipulated before the trial court as to the factual basis of this matter. According to the 2000 United States Census, Superior Court District 10A has a total population of 64,398 residents; District 10B has a total of 281,493 residents; District 10C has a total of 158,812 residents; and District 10D has a total of 123,143 residents. In 1987, pursuant to the then current version of N.C.G.S. § 7A-41, Districts 10A, 10C, and 10D each elected one superior court judge, while District 10B elected two superior court judges. However, in 1993 the General Assembly amended N.C.G.S. § 7A-41 to provide for the election of another superior court judge from District 10A, establishing the current districts as follows:

| Superior Court District | Residents | Number of Superior Court Judges | Residents per Superior Court Judge |
|---|---|---|---|
| 10A | 64,398 | 2 | 32,199 |
| 10B | 281,493 | 2 | 140,747 |
| 10C | 158,812 | 1 | 158,812 |
| 10D | 123,143 | 1 | 123,143 |

Plaintiffs Brian L. Blankenship and Thomas J. Dimmock are licensed attorneys who are qualified to run for the office of superior court judge in their respective districts, 10B and 10C. Plaintiff Frank D. Johnson is a citizen, taxpayer, and registered voter who resides in Superior Court District 10D. On 5 December 2005, by the filing of a complaint and the issuance of a civil summons, plaintiffs commenced suit against the North Carolina State Board of Elections; Gary Bartlett, in his official capacity as Executive Director of the State Board of Elections; and Roy Cooper, in his official capacity as Attorney General of North Carolina. In their complaint, plaintiffs allege that the 1993 amendment to N.C.G.S. § 7A-41 unconstitutionally created an additional superior court judgeship in Wake County's District 10A. On 9 December 2005, then Chief Justice I. Beverly Lake, Jr. designated this case as "exceptional" under Rule 2.1 of the General

Rules of Practice and assigned an emergency superior court judge, the Honorable Donald L. Smith, to hear the matter.

The trial court expedited the discovery and motions process and on 8 February 2006, following a two day bench trial, entered a judgment and order in favor of plaintiffs. The trial court concluded that the General Assembly acted arbitrarily and capriciously in creating "the judicial districts for superior court judges assigned to Wake County" and that "[t]he current districting plan for the election of superior court judges allocated to Wake County, North Carolina creates unequal weighing of votes." Based on the factual findings, the trial court concluded as a matter of law that N.C.G.S. § 7A-41 "as it applies to Wake County, North Carolina, is unconstitutional" because it "denies plaintiffs equal protection of the law under N.C. Const. Article I, § 16." The trial court stayed its order and judgment pending appeal.

Defendants appealed the trial court's judgment and order to the Court of Appeals, which held that there is no requirement of population proportionality in state judicial elections, that the trial court failed to consider evidence properly submitted by defendants, and that the trial court erred in finding that the General Assembly acted arbitrarily and capriciously in establishing the superior court districts at issue. This Court allowed plaintiffs' petition for discretionary review on 9 October 2008.

## ANALYSIS

### Plaintiffs' Equal Protection Challenge

[1] We must first determine whether the Equal Protection Clause of Article I, Section 19 of the North Carolina Constitution requires any degree of population proportionality in the districts drawn for the election of superior court judges. We conclude that it does.

The Equal Protection Clause of Article I, Section 19 of the State Constitution "prohibits the State from denying any person the equal protection of the laws." *Stephenson v. Bartlett*, 355 N.C. 354, 377, 562 S.E.2d 377, 393 (2002). Equal protection "requires that all persons similarly situated be treated alike." *Richardson v. N.C. Dep't of Corr.*, 345 N.C. 128, 134, 478 S.E.2d 501, 505 (1996) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Equal Protection Clause necessarily operates as a restraint on certain activities of the State that either create classifications of persons or interfere with a legally recognized right. *See White v. Pate*, 308 N.C. 759, 766-67, 304 S.E.2d 199, 204 (1983)

(detailing the levels of scrutiny applied in equal protection analysis depending upon the type of classification or the right allegedly infringed). This Court's analysis of the State Constitution's Equal Protection Clause generally follows the analysis of the Supreme Court of the United States in interpreting the corresponding federal clause. "However, in the construction of the provision of the State Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the Constitution of the United States is, though highly persuasive, not binding upon this Court." *Bulova Watch Co. v. Brand Distribs. of N. Wilkesboro, Inc.*, 285 N.C. 467, 474, 206 S.E.2d 141, 146 (1974) (citing *State v. Barnes*, 264 N.C. 517, 520, 142 S.E.2d 344, 346 (1965)).

The right to vote is one of the most cherished rights in our system of government, enshrined in both our Federal and State Constitutions. *See* U.S. Const. amend. XV; N.C. Const. art. I, §§ 9, 10, 11. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The right to vote on equal terms in representative elections— a one-person, one-vote standard—is a fundamental right. *Northampton Cty. Drainage Dist. No. One v. Bailey*, 326 N.C. 742, 747, 392 S.E.2d 352, 356 (1990).

Although federal courts have articulated that the "one-person, one-vote" standard is inapplicable to state judicial elections, there is considerable tension in the jurisprudence, as clearly illustrated by *Chisom v. Roemer*, 501 U.S. 380 (1991). *Chisom* first reaffirms that the one-person, one-vote constitutional standard used in legislative and executive branch elections does not apply to judicial elections. *Id.* at 402 ("[W]e have held the one-person, one-vote rule inapplicable to judicial elections . . . ." (citing *Wells v. Edwards*, 409 U.S. 1095 (1973))). When the Supreme Court first held the rule inapplicable, it summarily affirmed a district court decision based on the rationale that " '[j]udges do not represent people, they serve people.' " *Wells v. Edwards*, 347 F. Supp. 453, 455 (M.D. La. 1972) (quoting *Buchanan v. Rhodes*, 249 F. Supp. 860, 865 (N.D. Ohio), *appeal dismissed*, 385 U.S. 3 (1966), *judgment vacated per curiam*, 400 F.2d 882 (6th Cir. 1968)), *aff'd mem.*, 409 U.S. 1095 (1973). Yet, even in *Chisom*, the Supreme Court observed that judges were "representatives" for purposes of the Federal Voting Rights Act. 501 U.S. at 401 ("[I]t seems both reasonable and realistic to characterize the winners [of judicial elections] as representatives of that [judicial] district."). Moreover, in

**BLANKENSHIP v. BARTLETT**

[363 N.C. 518 (2009)]

*Republican Party of Minnesota v. White*, the Supreme Court rejected the notion that elected members of the judiciary are separate "from the enterprise of 'representative government.' " 536 U.S. 765, 784 (2002). Thus, the Supreme Court has indicated both that judges are representatives and that they do not represent people.

The presence of this seeming contradiction is not surprising. Judges are "often called upon to disregard, or even to defy, popular sentiment," creating a "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." *Chisom*, 501 U.S. at 400. That fundamental tension is manifested in the dueling conclusions that judges both are and are not representatives of the people. We agree with the Supreme Court that this tension "cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office." *Id.* at 400-01. Rather than wholly ignoring that tension, this Court acknowledges it by holding that our State's Equal Protection Clause requires a heightened level of scrutiny of judicial election districts.

At the same time, we readily recognize that many important interests are relevant to the crafting of judicial districts aside from mere population numbers. For instance, "[c]onvenience is an essential factor in arranging an effective judicial system, since it is often necessary for a judge to hear emergency measures." *Buchanan*, 249 F. Supp. at 864. The importance of this interest is reflected by the language used in our State Constitution requiring the legislature to divide the State into a "convenient number" of judicial districts. N.C. Const. art. IV, § 9. Further, there may be "diversity in [the] type and number of cases . . . in various localities" and "varying abilities of judges and prosecutors to dispatch the business of the courts." *Stokes v. Fortson*, 234 F. Supp. 575, 577 (N.D. Ga. 1964). The General Assembly has recognized the importance of the convenience of the people when traveling to county courthouses. While superior court sessions are generally held in the convenient, centralized location of the county seat, the General Assembly has allowed sessions of superior court to be held in larger cities that are not county seats. *See* N.C.G.S. § 7A-42 (2007). Because there are many important policy interests to be weighed in addition to population, we agree with the Supreme Court that strict scrutiny according to the one-person, one-vote rule is inappropriate here. *See Chisom*, 501 U.S. at 402-03.

We conclude that judicial elections have a component that implicates the fundamental right to vote and a separate component that is

ordinarily the province of the legislature, subject only to review for rationality by the courts. The right to vote on equal terms for representatives triggers heightened scrutiny, *see Stephenson*, 355 N.C. at 377-78, 562 S.E.2d at 393, even as the nonrepresentative aspects inherent in the role of the judiciary preclude strict scrutiny on a one-person, one-vote standard. Thus, neither rational basis nor strict scrutiny is an appropriate standard of review. Rather, we conclude the applicable standard lies somewhere in between.

Federal equal protection analysis provides us with another framework under which plaintiffs' claims should be decided. Federal courts have applied intermediate scrutiny in cases involving semisuspect classes, such as distinctions based upon gender, *Craig v. Boren*, 429 U.S. 190, 197 (majority), 210-11 (Powell, J., concurring) (1976); undocumented alien children, *Plyler*, 457 U.S. at 223-24, 230; and nonmarital children, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). In *Plyler*, the Supreme Court determined the constitutionality of a Texas statute and school district policy that excluded funding for children who were not "legally admitted" into the United States and also authorized local school districts to deny enrollment of such students in the public schools. 457 U.S. at 205. The Court noted that illegal immigrants are not a suspect class and public education is not a fundamental right guaranteed by the United States Constitution. *Id.* at 223. After asserting that public education is not a "right," the Court stated: "But neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Id.* at 221. Thus, considering the importance of education and how the statute at issue "imposes a lifetime hardship on a discrete class of children not accountable for their disabling status," *id.* at 223, the Court held that the statute "can hardly be considered rational unless it furthers some substantial goal of the state," *id.* at 224.

The dissenting opinion in *Plyler* recognized that the Court had "patch[ed] together bits and pieces of what might be termed [a] quasi-suspect-class and quasi-fundamental-rights analysis." *Id.* at 244 (Berger, C.J., dissenting). Other federal courts have recognized that "quasi-fundamental rights" are subject to a higher level of scrutiny than rational basis and a lower level of scrutiny than strict scrutiny. *See United States v. Harding*, 971 F.2d 410, 412 n.1 (9th Cir. 1992) (stating that the Supreme Court in *Plyler* "recognized that infringements on certain 'quasi-fundamental' rights, like access to public education, also mandate a heightened level of scrutiny"), *cert. denied*, 506 U.S. 1070 (1993); *Lowrie v. Goldenhersh*, 716 F.2d 401, 411 (7th

Cir. 1983) (stating that intermediate level review is "limited to cases involving quasi-fundamental rights or quasi-suspect classes" (citing John E. Nowak, *Realigning the Standards of Review Under the Equal Protection Guarantee—Prohibited, Neutral, and Permissive Classifications*, 62 Geo. L.J. 1071, 1082 (1974))); *Alma Soc'y Inc. v. Mellon*, 601 F.2d 1225, 1234 n.18 (2d Cir.) (noting that quasi-fundamental interests are subject to intermediate scrutiny), *cert. denied*, 444 U.S. 995 (1979); *Sam v. United States*, 682 F.2d 925, 935 (Ct. Cl. 1982) (stating that rational basis is the proper standard when neither fundamental nor quasi-fundamental rights are at stake), *cert. denied*, 459 U.S. 1146 (1983); *Houk v. Furman*, 613 F. Supp. 1022, 1029 n.3 (D. Me. 1985) (stating that commentators have noted that the application of intermediate scrutiny is limited "to cases involving 'a quasi-fundamental right or an "almost" suspect classification' " (quoting Martin H. Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications*, 55 Tex. L. Rev. 759, 773 (1977))); *Felix v. Milliken*, 463 F. Supp. 1360, 1370 (E.D. Mich. 1978) (recognizing that the Supreme Court in *Craig v. Boren* "arguably put legislatures on notice that a substantially closer relationship between the means chosen and the goals sought to be promoted by virtue of those means would be required in the future, at least where 'quasi-suspect' or 'quasi-fundamental' rights were affected"); *Frederick L. v. Thomas*, 408 F. Supp. 832, 836 (E.D. Pa. 1976) (recognizing that education is a "quasi-fundamental interest").

The North Carolina Constitution calls for the election of superior court judges and thus guarantees an individual right of the people to vote in those elections. N.C. Const. art. IV, § 9. "[A] constitution cannot be in violation of itself, and [] all constitutional provisions must be read *in pari materia*[.]" *Stephenson*, 355 N.C. at 378, 562 S.E.2d at 394 (internal citations omitted). Thus, although North Carolina is under no mandate to give its citizens the right to vote for superior court judges, once it has done so in its constitution, that provision must be construed in conjunction with the Equal Protection Clause to prevent internal conflict. *See id.* Stated simply, once the legal right to vote has been established, equal protection requires that the right be administered equally. *See Barbier v. Connolly*, 113 U.S. 27, 31 (1885) (stating that "equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights"). The dual nature of the nonrepresentative and representative aspects of elected superior court judges and the tensions inherent in any attempt to reconcile the right of the people to vote for superior court judges, the right to equal protection, and the legislature's

duty to draw convenient districts prevent us from declaring the right asserted by plaintiffs to be fundamental and entitled to strict scrutiny. However, the right asserted by plaintiffs is literally enshrined in the North Carolina Constitution and, as such, is distinguishable from other citizenship privileges that receive rational basis review. *See Plyler*, 457 U.S. at 221, 230 (majority). Accordingly, we hold that the right to vote in superior court elections on substantially equal terms is a quasi-fundamental right which is subject to a heightened level of scrutiny.

Federal jurisprudence offers an analogous situation in the realm of free speech. Individuals have challenged laws on the theory that regulation of certain types of conduct impermissibly restricts the First Amendment right to free speech. *See, e.g., United States v. O'Brien*, 391 U.S. 367, 370, 376-77 (1968) (upholding a statute banning destruction of selective service cards when defendant asserted First Amendment right to protest the draft by doing so). Acts of symbolic speech, or expressive conduct, combine speech and nonspeech elements in the same course of conduct. *See id.* at 376. The restriction on speech implicates fundamental First Amendment rights, even though regulation of nonspeech conduct is ordinarily subject only to rational basis review.

The Supreme Court held that when protected speech is combined with generally unprotected conduct, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* The Court then stated the level of scrutiny to be applied:

> [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377. The Supreme Court has referred to this formulation as intermediate scrutiny. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 185 (1997). In *Turner,* the Supreme Court, citing *O'Brien,* stated succinctly that an act reviewed under intermediate scrutiny "will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than nec-

essary to further those interests." *Id.* at 189 (citing *O'Brien*, 391 U.S. at 377).

Expressive conduct, which combines elements of a fundamental right with conduct generally subject to regulation reviewed only for a rational basis, is analogous to judicial elections, in that such elections combine representative and nonrepresentative aspects. We therefore apply a similar standard of intermediate scrutiny when considering equal protection challenges to judicial districts. Judicial districts will be sustained if the legislature's formulations advance important governmental interests unrelated to vote dilution and do not weaken voter strength substantially more than necessary to further those interests.

We have already noted several important governmental interests, but decline to fashion an exhaustive list. In addition to compliance with federal voting rights laws, *see Chisom*, 501 U.S. at 404, legitimate factors for the legislature's consideration include geography, population density, convenience, number of citizens in the district eligible to be judges, and number and types of legal proceedings in a given area. On remand, the parties are free to present other interests.

We emphasize that a plaintiff must make a prima facie showing of considerable disparity between similarly situated districts in order to trigger constitutional review. In the instant case, plaintiffs have demonstrated gross disparity in voting power between similarly situated residents of Wake County. In Superior Court District 10A, the voters elect one judge for every 32,199 residents, while the voters of the other districts in Wake County, 10B, 10C, and 10D, elect one judge per every 140,747 residents, 158,812 residents, and 123,143 residents, respectively. Thus, residents of District 10A have a voting power roughly five times greater than residents of District 10C, four and a half times greater than residents of District 10B, and four times greater than residents of District 10D. No other subdivided district in the State comes close to the degree of disproportionality found in District 10. Even comparing District 10A with dissimilar districts throughout the State, the voting strength disparity between District 10A and the other subdivisions of District 10 is unique. According to documents filed with this Court, District 10A has the lowest resident-to-judge ratio of any district in the State, while District 10C has the second highest resident-to-judge ratio.[1] No other districts that divide

---

1. This information is based on data contained in a document in the record entitled "Plan Statistics—Plan: Superior Courts 2005." The document does not include population numbers from District 12 or District 14.

a county have a voting strength disparity among the districts remotely approaching the ratios found in District 10. In order to make a prima facie showing of significant voting strength disparity, a plaintiff must demonstrate a disparity in voting power closely approaching the gross disparity in District 10 as divided into its four election districts, a phenomenon not currently present in any other judicial district in the State, as evinced by the record before us.

In sum, plaintiffs have made the required prima facie showing, triggering the State's duty to demonstrate significant interests that justify the legislature's subdivisions within District 10 and to show that the disparity in voter strength is not substantially greater than necessary to accommodate those interests. In the event the trial court finds a violation of state equal protection law, it should defer initially to the General Assembly for resolution. *See, e.g., Hoke Cty. Bd. of Educ. v. State*, 358 N.C. 605, 599 S.E.2d 365, 395 (2004) (recognizing "our limitations in providing specific remedies for [constitutional] violations committed by other government branches in service to a subject matter . . . that is within their primary domain").

Accordingly, we remand this case to the Court of Appeals for further remand to the trial court with orders to hold a new hearing and determine whether the State can meet its burden as set forth in this opinion.

## Admission of the Reinhartsen Affidavit and Exhibits

[2] Defendants filed the affidavit of Paul Reinhartsen, a Research Specialist for Legal Services for the Administrative Office of the Courts, with the trial court in support of their position. This affidavit states that Reinhartsen "maintain[s] and ha[s] access to previous submissions of the Administrative Office of the Courts" to the United States Department of Justice for preclearance under Section 5 of the Voting Rights Act. Attached to Reinhartsen's affidavit was what is described in the affidavit as "a true and accurate copy of the preclearance submission of 1993 Sess. Laws C. 321, §§ 200.4, 200.5 and 200.6," along with "related responses from the United States Department of Justice."[2]

The Court of Appeals held that the exhibits attached to Reinhartsen's affidavit were admissible under Rule 803(8) of the North Carolina Rules of Evidence, and we agree. Rule 803(8) provides:

---

2. The affidavit also noted that not all of the approximately 250 page session law was included, but only those portions relevant to the pending litigation.

Public Records and Reports.—Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law-enforcement personnel, or (C) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

N.C.G.S. § 8C-1, Rule 803(8) (2007). It is undisputed that the General Assembly has required the Administrative Office of the Courts to submit to the Attorney General of the United States "all acts of the General Assembly that amend, delete, add to, modify or repeal any provision of Chapter 7A of the General Statutes of North Carolina which constitutes a 'change affecting voting' under Section 5 of the Voting Rights Act of 1965." *Id.* § 120-30.9C (2007).

Thus, the records kept by the Administrative Office of the Courts concerning its submissions to the United States Department of Justice clearly fall within the purview of Rule of Evidence 803(8) as public records. Accordingly, the records are admissible insofar as they are relevant. *See id.* § 8C-1, Rule 402 (2007) ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules.").

After concluding the affidavit and exhibits were admissible under Rule 803(8), the Court of Appeals further determined that the trial court erred by admitting Exhibit A to the affidavit "on only a limited basis." *Blankenship*, 184 N.C. App. at 334, 646 S.E.2d at 589. On this point, we disagree because the trial court transcript does not provide adequate support for this determination.

The transcript reflects that plaintiffs moved the trial court to strike the affidavit and attached exhibits on the grounds that the documents were hearsay and many statements contained in the exhibits were opinions expressed without the declarant's personal knowledge of matters underlying those opinions. Throughout the conversation with counsel for both parties regarding the affidavit and attached exhibits, the trial court indicated at least three times that it was

admitting the evidence. On one of those occasions, the trial court stated: "I'm going to let it in, but I'm going to be very careful, and I want both of you [(referring to counsel)] to make sure I base no findings on anything contained in there that is hearsay or is made without personal knowledge."

Notably, the trial court's ultimate ruling was that the evidence at issue was admitted. In expressing caution over some of the material, the trial court did not admit the evidence only on a limited basis. Rather, the trial court recognized nothing more than what Rule 803(8) acknowledges already in its closing phrase—some "sources of information or other circumstances" may "indicate [a] lack of trustworthiness" in certain public records and reports. N.C.G.S. § 8C-1, Rule 803(8) (2007); *id.* cmt. (stating that "[t]he phrase 'unless the sources of information or other circumstances indicate lack of trustworthiness' applies to all three parts of the [Rule 803(8)] exception"). Pursuant to the last phrase of Rule 803(8), a trial court may decide in its discretion to exclude a public record or report altogether for "lack of trustworthiness." Instead, the trial court in the case *sub judice* admitted the evidence at issue in its discretion and then apparently made findings of fact based on what it considered trustworthy information. There is no inherent error in taking that course of action.

Defendants seem to argue that Rule 803(8) required the trial court to admit the evidence and that the admitted evidence then inexorably compelled the trial court to make findings of fact consistent with defendants' interpretation of that evidence. We disagree. Defendants may attack the trial court's findings of fact as being unsupported by competent evidence or challenge whether those factual findings in turn support the trial court's ultimate conclusions of law, *see, e.g., State v. Williams,* 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (citations omitted); however, defendants' insistence that the trial court improperly admitted evidence only on a limited basis mischaracterizes the transcript before us.

## CONCLUSION

Because the Equal Protection Clause of the North Carolina Constitution requires intermediate scrutiny of districts drawn for the election of superior court judges and because we find that the trial court properly considered the evidence before it, we reverse the decision of the Court of Appeals and remand the case to the Court of Appeals for further remand to the trial court for further proceedings not inconsistent with this opinion.

BLANKENSHIP v. BARTLETT

[363 N.C. 518 (2009)]

REVERSED AND REMANDED.

Justice TIMMONS-GOODSON dissenting.

Because I conclude that the election of superior court judges does not implicate the equal protection principle of "one person, one vote," I would hold that the judicial districting plan for Wake County set forth in N.C.G.S. § 7A-41 does not violate the Equal Protection Clause of the North Carolina Constitution. I therefore respectfully dissent.

It should first be noted "that 'this Court gives acts of the General Assembly great deference, and a statute will not be declared unconstitutional under our Constitution unless the Constitution clearly prohibits that statute.' " *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 167, 594 S.E.2d 1, 7 (2004) (quoting *In re Spivey*, 345 N.C. 404, 413, 480 S.E.2d 693, 698 (1997)). "Accordingly, there is a strong presump-. tion that the statute at issue is constitutional." *Id.* at 168, 594 S.E.2d at 7 (citing *Stephenson v. Bartlett*, 355 N.C. 354, 362, 562 S.E.2d 377, 384 (2002)); *see also Pender County v. Bartlett*, 361 N.C. 491, 497, 649 S.E.2d 364, 368 (2007) ("An act of the General Assembly is accorded a 'strong presumption of constitutionality' and is 'presumed valid *unless it conflicts with the Constitution*.' " (emphasis in original) (quoting *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam))).

The majority determines that the Equal Protection Clause of the North Carolina Constitution requires population proportionality in superior court districts. I disagree on several grounds.

First and foremost, superior court judges do not serve in a representative capacity, and their election therefore does not implicate the "one person, one vote" principle of equal protection. Population proportionality is important in legislative elections as it allows all voters to "enjoy the same representational influence or 'clout.' " *Stephenson*, 355 N.C. at 377, 562 S.E.2d at 393. Legislators use their influence to represent voters in a greater legislative body. Accordingly, voters from a district that elects three legislators have more influence than voters in districts with only two representatives. But judges have no similar representational function. Voters do not elect a judge to "represent" them—that is, to serve as their voice in government and advance their interests. *See, e.g., New York State Ass'n of Trial Lawyers v. Rockefeller*, 267 F. Supp. 148, 153 (S.D.N.Y. 1967) ("The state judiciary, unlike the legislature, is not the organ

responsible for achieving representative government."). Rather, judges serve the public as a whole. *See Holshouser v. Scott*, 335 F. Supp. 928, 932 (M.D.N.C. 1971) (Judges "do not govern nor represent people nor espouse the cause of a particular constituency. They must decide cases exclusively on the basis of law and justice and not upon the popular view prevailing at the time."), *aff'd mem.*, 409 U.S. 807, 34 L. Ed. 2d 68 (1972). The number of judges that voters elect in a given district does not affect the voters' political influences in the state legislature or in the courtroom, nor is a voter guaranteed of appearing before any particular judge.

Because judges serve the general public in a nonrepresentative capacity, there is no unequal protection among the voters of different districts that would trigger equal protection concerns:

> "[T]he one man-one vote doctrine, applicable as it now is to selection of legislative and executive officials, does not extend to the judiciary. Manifestly, judges and prosecutors are not representatives in the same sense as are legislators or the executive. Their function is to administer the law, not to espouse the cause of a particular constituency. Moreover there is no way to harmonize selection of these officials on a pure population standard with the diversity in type and number of cases which will arise in various localities, or with the varying abilities of judges and prosecutors to dispatch the business of the courts. An effort to apply a population standard to the judiciary would, in the end, fall of its own weight."

*Holshouser*, 335 F. Supp. at 931 (quoting *Stokes v. Fortson*, 234 F. Supp. 575, 577 (N.D. Ga. 1964)).

The second ground upon which I dissent is that the plain language of our Constitution, which expressly provides for flexibility in fashioning judicial districts, supports the judicial districting plan set forth in N.C.G.S. § 7A-41. Article IV, section 9 of the North Carolina Constitution provides: "The General Assembly shall, *from time to time*, divide the State into a *convenient* number of Superior Court judicial districts and shall provide for the election of *one or more* Superior Court Judges for each district." N.C. Const. art. IV, § 9(1) (emphasis added). As this Court stated in *State ex rel. Martin v. Preston*, 325 N.C. 438, 460-61, 385 S.E.2d 473, 485 (1989):

> Our Constitution anticipates that the needs of the state will change over time. It specifically provides that "[t]he General

**BLANKENSHIP v. BARTLETT**

[363 N.C. 518 (2009)]

Assembly shall, *from time to time,* divide the State into a *convenient* number of Superior Court judicial districts . . . ." N.C. Const. art. IV, § 9(1) (emphasis added). Contrary to the plaintiff's argument, there is no prohibition in our Constitution against the splitting of counties when creating superior court districts. Instead, our Constitution only requires that any division of the state into judicial districts be "convenient."

In contrast to the flexibility granted under Article IV, the language in our Constitution regarding the election of representatives and senators is much more specific, *see* N.C. Const. art. II, §§ 3 and 5. Redistricting of legislative elections occurs "at the first regular session convening after the return of every decennial census of population taken by order of Congress," *id.*, as opposed to the general guide of "from time to time," *id.* art. IV, § 9, for the election of superior court judges. The specificity with which the population proportionality is required by our Constitution ("Each [legislator] shall represent, *as nearly as may be,* an *equal number* of inhabitants, the number of inhabitants that each [legislator] represents being determined for this purpose by dividing the population of the district that he represents by the number of [legislators] apportioned to that district . . . ." *id.* art. II, §§ 3(1) and 5(1) (emphasis added)) stands in sharp contrast to the guidelines for creating a "convenient" number of districts within the state for judicial elections. *Id.* art. IV, § 9.

I must also note that the superior court division is a single unified court, having statewide jurisdiction, *see id.* art. IV, § 2, and that under our Constitution, rotation of superior court judges among the districts "shall be observed." *Id.* art. IV, § 11. Thus, requiring proportional representation in this case has the potential to affect other judicial districts in the state. *See New York Ass'n of Trial Lawyers,* 267 F. Supp. at 153 ("Nor can the direction that state legislative districts be substantially equal in population be converted into a requirement that a state distribute its judges on a per capita basis.").

Finally, the majority's determination that principles of equal protection require population proportionality in judicial districts is contrary to every other jurisdiction that has considered this issue.

The numerous courts which have been presented with judicial election cases are in rare unanimity on this point. Judicial officers are not subject to the one person-one vote principle and therefore a state's choice regarding the method of electing its judiciary is not subject to an equal protection challenge.

*In re Objections to Nomination Petition of Cavanaugh*, 65 Pa. Commw. 620, 638, 444 A.2d 1308, 1312 (1982); *see also Holshouser*, 335 F. Supp. at 930 ("We find no case where the Supreme Court, a Circuit Court, or a District Court has applied the 'one man, one vote' principle or rule to the judiciary."). The refusal of every other jurisdiction to apply population proportionality to judicial elections, including—as the majority acknowledges—the United States Supreme Court, should be highly persuasive to this Court. *See State v. Warren*, 252 N.C. 690, 696, 114 S.E.2d 660, 666 (1960) ("We are not bound by the decisions of the Courts of the other States, but should this Court hold the Act unconstitutional, North Carolina would be the only State to maintain this position. Such overwhelming authority is highly persuasive."). The majority offers little persuasive authority to support or explain why this Court should deviate from the reasoning of every other court in the country, particularly in light of the express flexibility in fashioning judicial districts granted under our Constitution. Instead, the majority engineers an imaginary "tension" and "contradiction" in the jurisprudence in order to disavow the unanimous authority contrary to its position. *See, e.g., In re Cavanaugh*, 65 Pa. Commw. at 638, 444 A.2d at 1312 (noting the "rare unanimity" among the "numerous courts which have been presented with judicial election cases" and citing those cases). The majority then selects from an assortment of constitutional analyses to cobble together its own novel approach to the issue of judicial districting. Such strained creativity by the majority is revealing. Moreover, how such an analysis is to be applied in future cases is unsettling.

Given the lack of equal protection concern and the well-established presumption in favor of the constitutionality of legislative acts, I would hold that N.C.G.S. § 7A-41 does not violate the Equal Protection Clause of the North Carolina Constitution and would affirm the Court of Appeals. As I conclude the trial court erred in declaring N.C.G.S. § 7A-41 unconstitutional, I need not address whether the trial court properly excluded evidence. I respectfully dissent.

Chief Justice PARKER and Justice HUDSON join in this dissenting opinion.