713 S.E.2d 546 (2011)
In re Appeal of Civil Penalty Don LIEBES, Gate City Billiards Country Club, Appellant,
v.
GUILFORD COUNTY DEPARTMENT OF PUBLIC HEALTH, Appellee.
No. COA10-979.
Court of Appeals of North Carolina.
July 19, 2011.
*548 Smith, James, Rowlett & Cohen, LLP, Greensboro, by Seth R. Cohen and J. David James, for Appellant.
Guilford County Attorney J. Mark Payne, for Appellee.
BEASLEY, Judge.
Don Liebes, Gate City Billiards Country Club (Gate City) appeals a trial court order upholding two civil penalties for allowing smoking in its establishment and contends N.C. Gen.Stat. § 130A-496 (Smoking Ban or Act) unconstitutionally limits its definition of "private club" to nonprofit corporations. Specifically, Gate City argues that the statutory scheme exempting nonprofit private clubs but including for-profit private clubs within the ambit of the Smoking Ban violates its equal protection rights. Because there exists a rational basis for the legislature's differential treatment of for-profit and nonprofit private clubs, we affirm the order.
Gate City Billiards Country Club (Gate City) is a commercial establishment that sells food and alcoholic beverages and is defined as a "private club" for retail permitting purposes under Chapter 18B of the North Carolina General Statutes, "Regulation of Alcoholic Beverages" (ABC Statute). See N.C. Gen.Stat. § 18B-1000(5) (2009). Gate City has billiard tables, which, according to its owner, Don Liebes, are the chief attraction for its clientele. Prior to the Smoking Ban, Gate City offered a smoking section to its patrons.
On 2 January 2010, "An Act to Prohibit Smoking in Certain Public Places and Certain Places of Employment" became effective.[1] Section 130A-496 thereunder prohibits smoking in restaurants and bars but exempts from its scope any "private club,"[2]see N.C. Gen.Stat. § 130A-496(a), (b)(3) (2011), which the Act defines as
[a] country club or an organization that maintains selective members, is operated by the membership, does not provide food or lodging for pay to anyone who is not a member or a member's guest, and is either incorporated as a nonprofit corporation in accordance with Chapter 55A of the General Statutes or is exempt from federal income tax under the Internal Revenue Code as defined in G.S. 105-130.2(1). For the purposes of this Article, private club includes country club.
N.C. Gen.Stat. § 130A-492(11) (2009). Because Gate City operates for a profit and is not a federally tax-exempt organization, it cannot claim private club status for purposes of this Smoking Ban exemption but nevertheless continued to allow smoking in its establishment.
By letter dated 3 March 2010, the Guilford County Department of Public Health (County) issued Liebes a $200 administrative penalty for Gate City's third Smoking Ban violation. Liebes received a fourth notice of violation dated 11 March 2010[3] and another $200 fine. Gate City appealed the penalties to the Guilford County Board of Health (Board), which held public hearings and issued two "Order[s] Upholding Civil Penalty" on 23 April and 2 June 2010, respectively. Gate City appealed both decisions to the district court pursuant to N.C. Gen.Stat. § 130A-24(d) and alleged that the Smoking Ban's private club exemption-which does not include for-profit businesses that at the same time qualify as private clubs under the ABC Statute-is not rationally related to a legitimate *549 state interest. Contending that this aspect of the Act violates equal protection both facially and as applied, Gate City sought reversal of the Board's orders and the issuance of a permanent injunction barring the County from enforcing N.C. Gen. Stat. § 130A-496 against Liebes and Gate City.
The district court consolidated the matters for hearing on 23 July 2010, and issued an order upholding the Board's decisions to uphold the civil penalties issued against Gate City. From this order, Gate City appeals, arguing that the Smoking Ban violates its "right to equal protection of the law under the United States and North Carolina Constitutions in that there is no rational basis for permitting smoking in nonprofit private clubs while prohibiting smoking in for-profit private clubs." We disagree.
"The Equal Protection Clause of Article I, Section 19 of the North Carolina Constitution and the Equal Protection Clause of Section 1 of the Fourteenth Amendment to the United States Constitution forbid North Carolina from denying any person the equal protection of the laws," and require that "all persons similarly situated be treated alike."
State v. Fowler, 197 N.C.App. 1, 26, 676 S.E.2d 523, 543-44 (2009) (internal citations omitted); see also Richardson v. N.C. Dept. of Correction, 345 N.C. 128, 134, 478 S.E.2d 501, 505 (1996) ("Our courts use the same test as federal courts in evaluating the constitutionality of challenged classifications under an equal protection analysis."). The Equal Protection Clauses function to restrain our state from engaging in activities "that either create classifications of persons or interfere with a legally recognized right." Blankenship v. Bartlett, 363 N.C. 518, 521, 681 S.E.2d 759, 762 (2009). Upon the challenge of a statute as violating equal protection, our courts must "first determine which of several tiers of scrutiny should be utilized" and then whether the statute "meets the relevant standard of review." Department of Transp. v. Rowe, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001). Where "[t]he upper tier of equal protection analysis requiring strict scrutiny of a governmental classification applies only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class," we apply the lower tier or rational basis test if the statute neither classifies persons based on suspect characteristics nor impinges on the exercise of a fundamental right. White v. Pate, 308 N.C. 759, 766-67, 304 S.E.2d 199, 204 (1983).
Neither Liebes nor his Gate City establishment, nor his patrons, comprise a suspect class. Moreover, smoking is not a fundamental right. See Craig v. Buncombe Co. Bd. of Education, 80 N.C.App. 683, 685, 343 S.E.2d 222, 223 (1986) ("The right to smoke in public places is not a protected right."); see also Roark & Hardee LP v. City of Austin, 394 F.Supp.2d 911, 918 (W.D.Tex. 2005) ("Of course it is clear that there is no constitutional right to smoke in a public place."); Batte-Holmgren v. Comm'r of Pub. Health, 281 Conn. 277, 914 A.2d 996 (2007) (prohibition against smoking in restaurants and other public places does not implicate a fundamental right). Nor do proprietors have a protected right to permit smoking by their patrons, regardless of whether the establishment is public or private. See, e.g., Coal. for Equal Rights, Inc. v. Owens, 458 F.Supp.2d 1251, 1263 (D.Colo.2006) (right of bar owners to allow smoking in their facilities is not fundamental), aff'd, 517 F.3d 1195 (10th Cir. 2008); Players, Inc. v. City of New York, 371 F.Supp.2d 522, 542 (S.D.N.Y.2005) (upholding smoking ban against private social club's equal protection challenge, noting limitations on smoking do not infringe fundamental constitutional rights); Am. Legion Post # 149 v. Wash. State Dep't of Health, 164 Wash.2d 570, 192 P.3d 306, 322 (2008) ("Because there is not a fundamental right to smoke, there is no privacy interest in smoking in a private facility."); Deer Park Inn v. Ohio Dep't of Health, 185 Ohio App.3d 524, 924 N.E.2d 898, 904 (2009) ("The right to smoke is not a fundamental right, nor is the right to allow smoking in a public place of employment on private property."). Thus, it is clear, as agreed by the parties, that the rational basis test applies here.
*550 The pertinent inquiry under rational basis scrutiny is whether the "distinctions which are drawn by a challenged statute or action bear some rational relationship to a conceivable legitimate governmental interest." Texfi Industries v. City of Fayetteville, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980). If the challenging party cannot prove that the statute bears no rational relationship to any legitimate government interest, the statute is valid. Fowler, 197 N.C.App. at 26, 676 S.E.2d at 544. "In assessing whether there is a legitimate government interest, `[i]t is not necessary for courts to determine the actual goal or purpose of the government action at issue; instead, any conceivable legitimate purpose is sufficient.'" Standley v. Town of Woodfin, 362 N.C. 328, 332, 661 S.E.2d 728, 731 (2008) (citation omitted). In fact,
[r]ational basis review is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.
Rhyne v. K-Mart Corp., 358 N.C. 160, 180-81, 594 S.E.2d 1, 15 (2004) (citation omitted). "With regard to the contention that the legislation does not bear a rational relationship to the ends sought, it has been held that the relationship need not be a perfect one...." State ex rel. Utilities Comm. v. Carolina Utility Cust. Assn., 336 N.C. 657, 681-82, 446 S.E.2d 332, 346 (1994). Moreover, the governmental classification enjoys a presumption of validity such that the challenging party "has a tremendous burden in showing that the questioned legislation is unconstitutional," as this lower tier of scrutiny is "so deferential" that "even if the government's actual purpose in creating classifications is not rational, a court can uphold the regulation if the court can envision some rational basis for the classification." Huntington Props., LLC v. Currituck Cty., 153 N.C.App. 218, 231, 569 S.E.2d 695, 704 (2002).
Gate City emphasizes that it is not challenging the Act's private clubs exception as unconstitutional; rather, it frames "[t]he narrow issue" as "whether there is a rational basis for distinguishing between for-profit and nonprofit private clubs" in the definition of private club. While this is a matter of first impression in our Courts, a Wisconsin court has addressed the identical question under a similar smoking ban exemption, articulating the same issue.
On its face, the ordinance does not independently classify for-profit and non-profit clubs. Instead, the ordinance distinguishes between restaurants and private clubs, with private clubs being defined as non-profit. Therefore, in the context of the ordinance's classifications, [the club's] argument is that there is no rational basis for defining private clubs as non-profit only.
City of Wausau v. Jusufi, 315 Wis.2d 780, 763 N.W.2d 201, 205 (Wis.Ct.App.2008). Assuming private membership organizations that operate for a profit are situated similarly to non-profit private clubs with respect to the statutory scheme involved here, we must determine whether there is a rational basis for including one and exempting the other.
While our General Assembly's stated intent in enacting the Smoking Ban was "to protect the health of individuals in public places and places of employment," N.C. Gen. Stat. § 130A-491(b) (2009), the Act articulates no rationale for defining private clubs as only those that are non-profit or federally tax-exempt. Accordingly, the question for this Court is whether we can discern any plausible policy reason for the difference in treatment or whether Gate City has met its burden, which requires it "to negative every conceivable basis which might support it." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211, 222 (1993); cf. Jusufi, 763 N.W.2d at 204 ("[W]hile the legislative body's purpose in enacting the ordinance was to protect the public from secondhand smoke in restaurants, it is undisputed that no rationale was articulated for defining private clubs as non-profit clubs only. Thus, whether a rational basis exists for the ordinance's classification scheme depends on whether we can construct one.").
*551 Gate City goes to great pains to point out that the private club status for which it qualifies under the ABC statute does not require the club to be a nonprofit organization, see N.C. Gen.Stat. § 18B-1000(5) (defining "private club" as "[a]n establishment that is organized and operated solely for a social, recreational, patriotic, or fraternal purpose and that is not open to the general public, but is open only to the members of the organization and their bona fide guests"), and argues that comparing the former with the definition of private club in the Smoking Ban shows "just how irrational the General Assembly's classification of for-profit private clubs and nonprofit private clubs truly is." Gate City calls it ironic that it "has been a `private club' under the ABC Statute since it began doing business in December 2008" and notes:
It would appear, therefore, that the General Assembly actually went out of its way to penalize and discriminate against for-profit private clubs by specifically exempting only nonprofit private clubs from its reach, even though the ABC Statute, which was already on the books, did no such thing.
Gate City ignores, however, that it has never been a "private club" for purposes of our statutes regulating food and beverage facilities as long as it has been a for-profit entity. Article 8 of Chapter 130A provides sanitation requirements for various industries, and Part 6 thereunder addresses food and lodging establishments but exempts private clubs. See N.C. Gen.Stat. § 130A-250(5) (2009). A private club under the food and lodging sanitation statutes is
an organization that maintains selective members, is operated by the membership, does not provide food or lodging for pay to anyone who is not a member or a member's guest, and is either incorporated as a nonprofit corporation in accordance with Chapter 55A of the General Statutes or is exempt from federal income tax under the Internal Revenue Code as defined in G.S. 105-130.2(1).
N.C. Gen.Stat. § 130A-247(2) (2009). Thus, the Smoking Ban's definition of private club challenged here is nearly identical to the definition used in the regulation of food and beverage facilities from which Gate City is not exempt. The General Assembly therefore had before it at least two different statutory definitions of private club if it wanted to choose one "already on the books" in exempting private clubs from the Smoking Ban. In terms of practical purposes, it seems entirely more rational for the legislature to define private club in the Smoking Ban the same way the term is defined in another Article under the same Chapter-where both the sanitation and smoking ban laws appear in Chapter 130A for "Public Health"-rather than using the ABC Statute's definition under its permitting scheme-where that Article is primarily grounded in concerns over retail activity and commerce. Thus, the General Assembly did not, in fact, go "out of its way to penalize and discriminate against for-profit private clubs by specifically exempting only nonprofit private clubs from [the Smoking Ban's] reach." Rather, it adopted a definition that has been employed, as amended, since 1983, see 1983 N.C. Sess. Laws ch. 891, § 2 (adding N.C. Gen.Stat. § 130A-247, et seq. regulating sanitation in restaurants and hotels but exempting private clubs, defined as "an establishment which maintains selective members, is operated by the membership and is not profit oriented" (emphasis added)); was crafted after the enactment of § 18B-1000(5), see 1981 N.C. Sess. Laws ch. 412, § 2, and thus found the ABC Statute's private club definition inappropriate for use in the sanitation law; and is used in a context more closely associated with that involved in the Smoking Ban.
Even if the sanitation laws' definition of private club did not exist, the General Assembly's decision to include a nonprofit requirement in the Smoking Ban's definition instead of copying the ABC Statute was rational. Where "[d]efining the class of persons subject to a regulatory requirement ... `inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, ... the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'" Beach Commc'ns, 508 U.S. at 315-16, 113 S.Ct. at 2102, 124 L.Ed.2d at 223 (citation omitted). As the Wisconsin Court reasoned in Jusufi, "[t]he [statute's] *552 method of distinguishing private clubs from other restaurants [and bars] seeks to protect the greatest number of restaurant [and bar] patrons [and employees], while preserving the right to associate in truly private clubs that are not open to the public." Jusufi, 763 N.W.2d at 205.
While the Act in this case prohibits smoking in restaurants and bars, it defines restaurant, for example, as "[a] food and lodging establishment that prepares and serves drink or food as regulated by the Commission [for Public Health] pursuant to Part 6 of Article 8 of this Chapter." N.C. Gen.Stat. § 130A-492(15); see also N.C. Gen.Stat. § 130A-247(5) ("`Establishment that prepares or serves food' means a business or other entity that cooks, puts together, portions, sets out, or hands out food for human consumption."). Thus, as the County notes, fraternal organizations that exist entirely for non-commercial purposes but may provide food and drink during their gatherings would be considered restaurants for the purposes of the Smoking Ban and could not allow their members to smoke if they were not otherwise exempted. Certainly, the General Assembly could have chosen not to excuse any establishments from the ambit of the Act and instead prohibited smoking in every place that fits the definition of a restaurant or bar. Still, it is entirely reasonable for the legislature to stop short of interfering with an individual's choice to smoke and an organization's freedom to allow or disallow smoking in a place that is genuinely closed to the general public but happens to serve food or drink as an incidental service to its members. The Act's exemption for private clubs is therefore rationally related to its legitimate purpose of protecting the health of individuals in public places. Insofar as the General Assembly's exemption for private clubs, apart from the manner in which the term is defined, is constitutional, Gate City agrees ... or appears to.
However, Gate City's argument that the definition of private club violates equal protection hinges, in large part, on the fact that the Act intends to protect the health of individuals by prohibiting smoking not only in public places but also in places of employment. See N.C. Gen.Stat. § 130A-491. Gate City contends that the fraternal organizations discussed by the Countysuch as Elks clubs, Moose lodges, and VFWsare also places of employment because they hire employees to serve the food and alcohol that would otherwise bring them within the reach of the Smoking Ban, suggesting:
it is difficult to understand how the General Assembly, on one hand, could clearly set forth its governmental interest of protecting the health of individuals in places of employment, while on the other hand, specifically excluding nonprofit private clubs from the smoking ban. The General Assembly cannot have it both ways. It can include both groups, i.e., for-profit private clubs and nonprofit private clubs in the smoking ban, or it can exclude both types of private clubs. By treating the two types of private clubs differently, the General Assembly has failed to "link" the classification and the objective of the statute.
....
Stated differently, what is the rational basis for treating employees of private nonprofit ... clubs and fraternal organizations differently from employees of private, for-profit billiards clubs ... given the intent of the General Assembly in protecting the health of individuals in places of employment[?]
This "all or nothing" argument is flawed in the sense that it admittedly has no impact on the "the narrow issue in this case," as emphasized by Gate City, and that such reasoning contradicts the position Gate City simultaneously advocates.
Initially, Gate City's proposition tends to subject any private club exception to scrutiny, since both nonprofit and for-profit clubs that serve food, drinks, or alcoholincluding Gate Citytend to have employees. Gate City, however, explicitly leaves "for another day" the question of whether an exclusion for all private clubs, whether for or nonprofit, is rationally based. At the same time, Gate City specifically stated to this Court that it was not arguing that the private club exception was unconstitutionaland in fact shared its belief that a general exemption for private clubs meets the rational basis testbut was *553 focusing only on the narrow issue of the private club definition. Thus, Gate City's reliance on the employment aspect implicates the constitutionality of exempting private clubs at all, a question that is explicitly omitted from this appeal, not the distinction between for-profit and nonprofit private clubs in the definition of the term, and is inapplicable to the narrow question presented.
Moreover, Gate City's identification of the "narrow issue" as "whether there is a rational basis to distinguish for-profit private clubs from nonprofit private clubs as it relates to the government's interest in protecting the health of individuals in places of employment" neglects the other purpose of the Smoking Ban, which is to prohibit smoking in public places. See N.C. Gen.Stat. § 130A-491. The United States Supreme Court has made clear that "social and economic legislation is valid unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." Hodel v. Indiana, 452 U.S. 314, 332, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40, 56 (1981) (emphasis added) (internal quotation marks and citation omitted).
Thus, where one of the Act's undisputedly legitimate purposes is to ban smoking in public places, an exemption for establishments that may be characterized as "restaurants" or "bars" under the law, but are truly private organizations, is rationally related to this legislative goal, even if it does not further the other goal of banning smoking in places of employment. In fashioning a definition of private club that best represented the types of establishments it deemed appropriate for exemption from the Act, the General Assembly clearly had to draw the line somewhere.
"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination."
Beach Commc'ns, 508 U.S. at 316, 113 S.Ct. at 2102-03, 124 L.Ed.2d at 223 (citation omitted); see also Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501 (1970) ("In the area of ... social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect."). Where "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodationsillogical, it may be, and unscientific," a classification with "some reasonable basis" does not violate equal protection "simply because [it] is not made with mathematical nicety or because in practice it results in some inequality." Dandridge, 397 U.S. at 485, 90 S.Ct. at 1161, 25 L.Ed.2d at 502 (internal quotation marks and citations omitted). We observe several possible bases for the legislature's decision to limit its definition of private club to membership organizations that operate as non-profits.
In Jusufi, the Wisconsin Court raised one concern about a more expansive definition of private clubs that did not include the non-profit element, which our General Assembly may have shared. There, the circuit court concluded that "a rational basis existed for the ordinance's classification and treatment of restaurants and private clubs" because it
requires all restaurants that are open to the public to be smoke free. Private clubs are, by their very nature, not open to the public, and do not present the same threat to public health. Limiting the exception to private clubs that are non-profit and have tax-exempt status is a reasonable means of keeping the number of places that qualify for the exception small, thereby protecting a greater percentage of the dining public; it also prevents restaurants that are open to the public from avoiding the reach of the ordinance by charging a nominal membership fee and declaring themselves to be private clubs.
*554 Jusufi, 763 N.W.2d at 203-04. The Wisconsin Court of Appeals agreed with the lower court's reasoning, noting that "[t]he ordinance's method of distinguishing private clubs from other restaurants seeks to protect the greatest number of restaurant patrons, while preserving the right to associate in truly private clubs that are not open to the public." Id. at 205. The Court further explained:
Absent the ordinance's narrow definition of private clubs as non-profit organizations controlled by their members, ordinary for-profit restaurants seeking the public's patronage would be able to avoid enforcement of the smoking ban by instituting a few formalities. Restaurants could create the illusion of private clubs by creating memberships with no meaningful membership criteria. The memberships would essentially be shams, with members having no control over, or stake in, the restaurant's operations. As such, the restaurants could identify themselves as private clubs, while remaining open to the public.
Id. Where the club's only hurdle was a one-dollar, one-time membership fee; its board of directors had no control over the club's business; and, notwithstanding its charitable activities, was still a restaurant "effectively open to the public," the court held the "restaurant's customers are those the smoking ban is designed to protect." Id. at 205-06. The facts of the case precisely justified the differential treatment of restaurants and private clubs, and the narrow definition of private clubs was germane to "the ordinance's purpose of protecting the dining public from secondhand smoke," thus satisfying the rational basis test. Id. at 206. It is conceivable that the North Carolina legislature recognized the same potential consequences of a broader definition of private club that was not limited to nonprofits.
It is further plausible that actual data convinced the General Assembly to draw the Smoking Ban exemptions narrowly, where problems with the ABC Statute's broader private club definition have been documented. For example, several contested cases in the Office of Administrative Hearings between the North Carolina Alcoholic Beverage Control Commission (NC ABC) and various ABC permit holders reveal that establishments with permits issued to them as private clubs often open themselves to the public despite the ABC Statute's prohibition of the same. See, e.g., Kirkley v. NCABC, No. 08 ABC 2629, 31 N.C. Admin. Dec. 248, 249 (Apr. 15, 2009) (concluding business that held temporary Mixed Beverage Private Club permit "was routinely open to the public" and "failed to maintain on the licensed premises membership applications and other paperwork required for a private club"); NCABC v. Red Lion Manestream, Inc., No. 04 ABC 0695, 26 N.C. Admin. Dec. 509, 510 (July 20, 2004) (concluding permit holder "allowed [its] private club to be open to the general public in violation of ABC Commission Rule 4 NCAC 2S.0107(a)"); C & C Entm't, Inc. v. NCABC, 03 ABC 1037, 25 N.C. Admin. Dec. 659, 660 (Sept. 20, 2003) (concluding temporary permit holder "allowed Carolina Live to be open to the general public by failing to limit the use of this private club to members and their guests in violation of 4 NCAC 2S.0107(a)"); NCABC v. BLL Enters., Inc., 01 ABC 2207, 24 N.C. Admin. Dec. 388, 389 (May 7, 2002) (finding NCABC had previously suspended establishment's ABC permits for "allowing the licensed premises to be open to the general public by failing to limit the use of the private club to members and their guests").[4]
Moreover, on 31 July 2009, the General Assembly passed "An Act to Clarify the Authority of the ABC Commission to Adopt Rules Concerning Private Clubs," 2009 Sess. Laws ch. 381, which required the ABC Commission to "examine on a continuing basis the record of violations and noncompliance with Commission rules for ABC establishments operating as private clubs, and ... report its findings to the Joint Legislative Corrections, Crime Control, and Juvenile Justice Oversight Committee," id. § 2. Such legislation suggests that a certain practice has developed whereby ABC permits are obtained by *555 establishments under the guise of operating as a private club while they simultaneously remain open to the public and fail to heed the ABC Commission rules. It is thus entirely logical to believe that these compliance and enforcement problems were pervasive enough to deter the General Assembly from implementing a private club definition in the Smoking Ban context that was the same or similar to that of the ABC Statute. Rather than rely on a definition that has been proven to be subject to avoidance, the legislature reasonably imposed a more narrowly tailored definition of private clubs to effectuate the purpose of the exemption.
Several courts have employed the multi-factor framework set forth in United States v. Lansdowne Swim Club, 713 F.Supp. 785 (E.D.Pa.1989), to determine whether a club is truly private or whether the so-called membership organization was actually open to the public at large. Included among the eight factors listed are: the genuine selectivity of the group's admitted members; the membership's control over the operations of the establishment; the use of facilities by non-members; the formalities observed, such as bylaws, meetings, and membership cards; and, pertinently, whether the club is a profit or nonprofit organization. Lansdowne Swim Club, 713 F.Supp. at 796-97 (emphasis added); see also Daniel v. Paul, 395 U.S. 298, 301-02, 89 S.Ct. 1697, 1699, 23 L.Ed.2d 318, 323 (1969) (concluding that "a business operated for a profit with none of the attributes of self-government and member-ownership traditionally associated with private clubs" was not a private club and that the "`membership' device" of a twenty-five cent seasonal fee and membership card was "no more than a subterfuge designed to avoid coverage of the 1964 Act").
While Lansdowne Swim Club involved the private club exemption under Title II of the 1964 Civil Rights Act, id. at 795, several cases have relied on its discussion to analyze other private club exemptions under state or local laws, see, e.g., Taverns for Tots, Inc. v. City of Toledo, 307 F.Supp.2d 933, 944 (holding organization would not qualify as private club under Lansdowne's factors and thus "does not meet any conventional definition of a `private' club or association," nor was it a "bona fide not-for-profit corporation," precluding it from seeking an exemption under municipal anti-smoking ordinance); People v. A Bus. or Buss. Located at 2896 W. 64th Ave., 989 P.2d 235, 238-39 (Colo.Ct.App.1999) (holding nude spa house was not private club where only membership qualification was being a 21-year-old male willing to initial an application and pay membership fee; existing club members had no control over operation; formalities were not observed; and club was operated for a profit, such that "[t]he sole purpose of the purported conversion to a private club format appear[ed] to be for the avoidance of the county ordinances"); Hendricks v. Commonwealth, 865 S.W.2d 332, 335 (Ky.1993) (Lansdowne factors also indicated "the Society was established for the sole purpose of avoiding the requirements of a newly enacted city ordinance regarding nudity in a public place").
Our General Assembly reasonably allowed for a private club exemption from the Smoking Ban. See Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786, 798-99 (1982) ("A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." (emphasis added)). It is likewise rational that it defined "private club" in such a way that incorporated several of the widely accepted factors used in determining whether a club is truly private or if an entity is merely cloaking itself as a membership organization as a subterfuge to avoid a certain law. Where an establishment's for or nonprofit status may be more readily discernible than some of the other Lansdowne factors, which are susceptible to fact-intensive inquiries and an interpretation of those facts, the legislature could have chosen to include the nonprofit requirement to achieve a more objective enforcement process. Gate City has not negated any of these conceivable bases for the differential treatment of for-profit and nonprofit private clubs. See Beach Commc'ns, 508 U.S. at 315, 113 S.Ct. at 2102, 124 L.Ed.2d at 222 ("[T]hose attacking the rationality of the *556 legislative classification have the burden `to negative every conceivable basis which might support it.'" (citation omitted)). Nor has the billiards club presented any evidence of its own membership selection criteria, membership fee requirements, guest-use policy or organizational formalities, involvement of the membership in its operations, or otherwise suggest that it would qualify as a private club under factors similar to Lansdowne despite the fact that it operates for a profit. As such, we conclude that Gate City has failed to prove that the Smoking Ban's private club definition, exempting nonprofit private clubs but not those that are for profit, unconstitutionally violates the Equal Protection Clauses, either facially or as applied to Gate City. Therefore, we affirm the trial court's order upholding the Board's decisions to uphold the two administrative penalties levied against Gate City for violations of the Smoking Ban.
Affirmed.
Judges McGEE and BRYANT concur.
NOTES
[1] Codified at N.C. Gen.Stat. § 130A-491 et seq., the Act also amended Chapter 130A, Article 23, which already prohibited smoking in State government buildings and vehicles. See N.C. Gen. Stat. § 130A-493 (2009).
[2] The other two exceptions include designated smoking guest rooms in certain lodging establishments and certain cigar bars. N.C. Gen.Stat. § 130A-496(b)(1)-(2).
[3] This notice was misdated as 3 March, but the parties stipulated that the document should be corrected to reflect the actual date of 11 March 2010.
[4] Each of these administrative decisions is also available at http://www.ncoah.com/hearings/ decisions/.