IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-762

 Filed: 18 February 2020

Wake County, No. 18 CVS 15292

JABARI HOLMES, FRED CULP, DANIEL E. SMITH, BRENDON JADEN PEAY,
SHAKOYA CARRIE BROWN, and PAUL KEARNEY, SR., Plaintiffs

 v.

TIMOTHY K. MOORE in his official capacity as Speaker of the North Carolina House
of Representatives; PHILIP E. BERGER in his official capacity as President Pro
Tempore of the North Carolina Senate; DAVID R. LEWIS in his official capacity as
Chairman of the House Select Committee on Elections for the 2018 Third Extra
Session; RALPH E. HISE in his official capacity as Chairman of the Senate Select
Committee on Elections for the 2018 Third Extra Session; THE STATE OF NORTH
CAROLINA; and THE NORTH CAROLINA STATE BOARD OF ELECTIONS,
Defendants

 Appeal by Plaintiffs from Order entered 19 July 2019 by Judges Nathaniel J.

Poovey, Vince M. Rozier, Jr., and Michael J. O’Foghludha in Wake County Superior

Court. Heard in the Court of Appeals 22 January 2020.

 Southern Coalition for Social Justice, by Jeffrey Loperfido and Allison J. Riggs,
 and Paul, Weiss, Rifkind, Wharton & Garrison LLP, by Andrew J. Ehrlich,
 Ethan Merel, Apeksha Vora, Jane B. O’Brien, Paul D. Brachman, Jessica Anne
 Morton, and Laura E. Cox, pro hac vice, for plaintiffs-appellants.

 Phelps Dunbar LLP, by Nathan A. Huff, and Cooper & Kirk, PLLC, by David
 H. Thompson, Peter A. Patterson, and Nicole Frazer Reaves, pro hac vice, and
 by Nicole J. Moss, for legislative defendants-appellees.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Olga E.
 Vysotskaya de Brito, Senior Deputy Attorney General Amar Majmundar, and
 Special Deputy Attorney General Paul M. Cox, for defendants-appellees the
 State of North Carolina and the North Carolina State Board of Elections.
 HOLMES V. MOORE

 Opinion of the Court

 HAMPSON, Judge.

 Factual and Procedural Background

 Jabari Holmes, Fred Culp, Daniel E. Smith, Brendon Jaden Peay, Shakoya

Carrie Brown, and Paul Kearney, Sr. (collectively, Plaintiffs)1 appeal from an Order

Denying Plaintiffs’ Motion for Preliminary Injunction and Denying in Part and

Granting in Part Defendants’ Motions to Dismiss (Order) filed on 19 July 2019,

concluding in part Plaintiffs were not entitled to a preliminary injunction enjoining

Senate Bill 824, titled “An Act to Implement the Constitutional Amendment

Requiring Photographic Identification to Vote,” (S.B. 824),2 which established, inter

alia, photographic voter identification (photo ID) requirements for elections in North

Carolina. The Record before us tends to show the following:

 1 On 18 September 2019, Plaintiffs filed a Motion with this Court requesting we take judicial
notice of Plaintiff Shakoya Carrie Brown’s Notice of Voluntary Dismissal filed with the trial court on
16 September 2019. However, Plaintiffs have failed to make a motion to amend the Record under
N.C.R. App. P. 9(b)(5), which is “the proper method to request amendment of the record[.]” Horton v.
New South Ins. Co., 122 N.C. App. 265, 267, 468 S.E.2d 856, 857 (1996). Further, “we will not take
judicial notice of a document outside the record when no effort has been made to include it.” Id. at
268, 468 S.E.2d at 858. Accordingly, we deny Plaintiffs’ Motion. Plaintiffs also have not filed any
motion in this Court requesting Ms. Brown be dismissed or permitted to withdraw from this appeal.
 2 S.B. 824 was subsequently enacted as North Carolina Session Law 2018-144. See 2018 N.C.

Sess. Law 144 (N.C. 2018) (codified as amended at N.C. Gen. Stat. §§ 20-37.7; 130A-93.1; 161-10; 163A-
741, -821, -867, -869, -869.1, -913, -1133-34, -1137, -1145.1-3, -1298, -1300, -1303, -1306-10, -1315, -
1368, -1389, -1411, -1520 (2018)); see also 2018 N.C. Sess. Law 146, § 3.1(a) (N.C. 2018) (authorizing
the recodification of Chapter 163A into Chapters 163, 138A, and 120C). The challenged provisions of
S.B. 824 are now found at Sections 163-82.8A (photo-ID requirement), -166.16 (list of valid photo IDs),
-166.17 (student-ID requirements), -166.18 (government-ID requirements), -229 (absentee ballots), -
230.2 (absentee ballots), -166.7, -227.2, and -22 of our General Statutes. See N.C. Gen. Stat. §§ 163-
82.8A; -166.16-18; -229; -230.2; -166.7; -227.2; -22 (2019). Because the parties refer to Session Law
824 as S.B. 824, we too refer to it as S.B. 824.

 -2-
 HOLMES V. MOORE

 Opinion of the Court

 On 6 November 2018, a majority of North Carolina voters, approximately 55%,

voted in favor of amending Article VI of the North Carolina Constitution by requiring

voters to present qualifying photo ID before casting a ballot. Sections 2(4) and 3(2)

of Article VI of the North Carolina Constitution now provide:

 Voters offering to vote in person shall present photographic
 identification before voting. The General Assembly shall enact
 general laws governing the requirements of such photographic
 identification, which may include exceptions.

N.C. Const. art. VI, §§ 2(4), 3(2).

 Less than a month after approval of this constitutional Amendment and during

a “lame-duck” legislative session, the General Assembly passed S.B. 824 as

implementing legislation on 6 December 2018. Governor Roy Cooper (Governor

Cooper) vetoed S.B. 824 on 14 December 2018. Five days later, the General Assembly

reconvened and overrode Governor Cooper’s veto. Thus, on 19 December 2018, S.B.

824 became law. 2018 N.C. Sess. Law 144.

 At its core, S.B. 824 requires all voters, both those voting in person or by

absentee ballot, “produce” an acceptable form of identification “that contain[s] a

photograph of the registered voter[.]” Id. § 1.2(a); see also id. § 1.2(e). Section 1.2(a)

designates ten different forms of acceptable IDs:

 1. North Carolina driver’s licenses;

 2. Certain nontemporary IDs issued by the Division of Motor
 Vehicles (DMV);

 -3-
 HOLMES V. MOORE

 Opinion of the Court

 3. United States passports;

 4. North Carolina voter photo-ID cards;

 5. Tribal enrollment cards issued by a state or federally
 recognized tribe;

 6. Certain student IDs issued by post-secondary institutions;

 7. Certain employee IDs issued by a state or local government
 entity;

 8. Out-of-state driver’s licenses or special ID cards for
 nonoperators for newly registered voters;

 9. Military IDs issued by the United States government; and

 10. Veterans IDs issued by the United States Department of
 Veterans Affairs.

Id. § 1.2(a). Under this Section, the first eight forms of ID may be used only if “valid

and unexpired, or . . . expired for one year or less[.]” Id. Whereas, military and

veterans IDs may be used “regardless of whether the identification contains a printed

expiration or issuance date[.]” Id. Moreover, if a voter is sixty-five years old or older,

any expired form of identification allowed above is deemed valid if it was unexpired

on the voter’s sixty-fifth birthday. Id. Student and government-employee IDs,

however, do not automatically qualify as acceptable IDs. Instead, post-secondary

institutions and public employers must apply to the North Carolina State Board of

Elections for approval of their IDs. See id. §§ 1.2(b)-(c) (containing original approval

 -4-
 HOLMES V. MOORE

 Opinion of the Court

process); see also 2019 N.C. Sess. Law 22, §§ 2-3 (N.C. 2019) (amending approval

process).

 S.B. 824 also contains two ways for voters to obtain free photo-ID cards. First,

a registered voter may visit their county board of elections and receive an ID “without

charge” so long as the voter provides their name, date of birth, and the last four digits

of their social security number. 2018 N.C. Sess. Law 144, § 1.1(a). Second, under

Section 1.3(a), voters over the age of seventeen may obtain free of charge a

nonoperator-ID card from the DMV as long as the voter provides certain

documentation, such as a birth certificate. Id. § 1.3(a). If the voter does not have this

documentation, the State must supply it free of charge. See id. § 3.2(b). Similarly, if

a registered voter’s driver’s license has been “seized or surrendered due to

cancellation, disqualification, suspension, or revocation[,]” the DMV must

automatically mail the voter a “special identification card” that can be used for voting.

Id. § 1.3(a).

 Lastly, S.B. 824 contains several exemptions to its photo-ID requirements.

Exemptions exist for voters who (1) have “a religious objection to being

photographed,” (2) are victims of a recent natural disaster, or (3) “suffer[ ] from a

reasonable impediment that prevents [them] from presenting photograph

identification[.]” Id. § 1.2(a). If one of these circumstances applies, a voter may cast

a “provisional ballot” by “complet[ing] an affidavit under penalty of perjury at the

 -5-
 HOLMES V. MOORE

 Opinion of the Court

voting place” affirming their identity and their reason for not presenting photo ID.

Id. After submitting this affidavit, the county board of elections “shall find that the

provisional ballot is valid unless the county board has grounds to believe the affidavit

is false.” Id. In a similar vein, if a registered voter fails to bring their acceptable ID

to the polls, the voter may “cast a provisional ballot that is counted only if the

registered voter brings an acceptable form of photograph identification . . . to the

county board of elections no later than the end of business on the business day prior

to the canvass . . . of elections[.]” Id.

 On the same day S.B. 824 became law, Plaintiffs filed their Verified Complaint

(Complaint) in this action in Wake County Superior Court against Timothy K. Moore,

in his official capacity as Speaker of the North Carolina House of Representatives;

Philip E. Berger, in his official capacity as Present Pro Tempore of the North Carolina

Senate; David R. Lewis, in his official capacity as Chairman of the House Select

Committee on Elections for the 2018 Third Extra Session; Ralph E. Hise, in his official

capacity as Chairman of the Senate Select Committee on Elections for the 2018 Third

Extra Session (collectively, Legislative Defendants); the State of North Carolina; and

the North Carolina State Board of Elections (collectively, State Defendants).3 In their

Complaint, Plaintiffs alleged six causes of action claiming S.B. 824 facially violates

various provisions of the North Carolina Constitution. In particular, Plaintiffs

 3 We refer to both Legislative and State Defendants collectively as Defendants.

 -6-
 HOLMES V. MOORE

 Opinion of the Court

alleged S.B. 824 violates the Equal Protection Clause found in Article I, Section 19 of

the North Carolina Constitution, claiming S.B. 824 was enacted with racially

discriminatory intent and thereby intentionally discriminates against voters of color

(Discriminatory-Intent Claim). The same day, Plaintiffs also filed a Motion for

Preliminary Injunction (Preliminary-Injunction Motion) seeking a preliminary

injunction to prevent “Defendants from implementing in any regard, relying on,

enforcing, conducting elections, or preparing to conduct any elections in conformity

with the voter ID provisions of [S.B.] 824, specifically Parts I and IV.” In response,

Legislative and State Defendants each filed Motions to Dismiss on 22 January and

21 February 2019, respectively.

 The Chief Justice of the North Carolina Supreme Court transferred this case

to a three-judge panel on 19 March 2019. See N.C. Gen. Stat. § 1-267.1(a1) (2019)

(requiring the transfer of “any facial challenge to the validity of an act of the General

Assembly” to a three-judge panel of the Superior Court of Wake County). After

hearing arguments from the parties, the three-judge panel entered its Order on

Defendants’ Motions to Dismiss and Plaintiffs’ Preliminary-Injunction Motion on 19

July 2019. In its Order, the trial court dismissed all of Plaintiffs’ claims except for

Plaintiffs’ Discriminatory-Intent Claim, concluding “Plaintiffs have made sufficient

factual allegations to support” this Claim. However, a majority of the panel denied

Plaintiffs’ Preliminary-Injunction Motion, concluding “Plaintiffs have failed to

 -7-
 HOLMES V. MOORE

 Opinion of the Court

demonstrate a likelihood of success on the merits” of their Discriminatory-Intent

Claim. One judge dissented from the portion of the Order denying Plaintiffs’

Preliminary-Injunction Motion because, in his opinion and based on the evidence

before the panel, “Plaintiffs have shown a reasonable probability of success on the

merits [of Plaintiffs’ Discriminatory-Intent Claim] and that the issuance of an

injunction is necessary to protect Plaintiffs’ rights during the litigation.” (citation

omitted). On 24 July 2019, Plaintiffs filed Notice of Appeal from the trial court’s

Order. See N.C. Gen. Stat. § 7A-27(b)(3)(a) (2019).

 Appellate Jurisdiction

 The trial court’s Order in this case both partially dismissed Plaintiffs’ claims

and denied the Preliminary-Injunction Motion. This Order does not contain a

certification of the dismissed claims for immediate appeal under Rule 54(b), and

Plaintiffs do not bring forward any arguments regarding the dismissed claims. Thus,

we do not address the trial court’s dismissal of those claims and leave that aspect of

the Order undisturbed. Rather, Plaintiffs only contend the trial court erred in

denying the Preliminary-Injunction Motion.

 The denial of a preliminary injunction is interlocutory in nature. See A.E.P.

Industries v. McClure, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (citation

omitted); see also Cagle v. Teachy, 111 N.C. App. 244, 247, 431 S.E.2d 801, 803 (1993)

(“An interlocutory order . . . is one made during the pendency of an action which does

 -8-
 HOLMES V. MOORE

 Opinion of the Court

not dispose of the case, but leaves it for further action by the trial court in order to

settle and determine the entire controversy.” (citation omitted)). A party may appeal

an interlocutory order if it “deprives the appellant of a substantial right which he

would lose absent a review prior to final determination.” A.E.P. Industries, 308 N.C.

at 400, 302 S.E.2d at 759.

 A substantial right has consistently been defined as “a legal right affecting or

involving a matter of substance as distinguished from matters of form: a right

materially affecting those interests which one is entitled to have preserved and

protected by law: a material right.” Gilbert v. N.C. State Bar, 363 N.C. 70, 75, 678

S.E.2d 602, 605 (2009) (alteration, citation, and quotation marks omitted). “The

burden is on the appellant to establish that the order deprives the appellant of a

substantial right which would be jeopardized absent a review prior to a final

determination on the merits.” Coates v. Durham Cty., ___ N.C. App. ___, ___, 831

S.E.2d 392, 394 (2019) (citation and quotation marks omitted). “We consider whether

a right is substantial on a case-by-case basis.” Gilbert, 363 N.C. at 75, 678 S.E.2d at

605.

 Here, Plaintiffs assert the Order affects a substantial right of theirs—namely,

“the right to vote on equal terms and free from intentional discrimination[.]” Indeed,

our Supreme Court has recognized: “The right to vote is one of the most cherished

rights in our system of government, enshrined in both our Federal and State

 -9-
 HOLMES V. MOORE

 Opinion of the Court

Constitutions.” Blankenship v. Bartlett, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009)

(citing U.S. Const. amend. XV; N.C. Const. art. I, §§ 9, 10, 11); see also Wesberry v.

Sanders, 376 U.S. 1, 17, 11 L. Ed. 2d 481, 492 (1964) (“No right is more precious in a

free country than that of having a voice in the election of those who make the laws

under which, as good citizens, we must live. Other rights, even the most basic, are

illusory if the right to vote is undermined.”). More specifically, though, Plaintiffs

contend their substantial right—“to go to the polls in the March 2020 primary [and

in the fall general elections] under laws that were not designed to make it harder for

them and other voters of color to vote”—will be lost absent review and imposition of

a preliminary injunction by this Court.

 In contrast, Legislative Defendants argue no substantial right of these

individual Plaintiffs will be lost absent review because all Plaintiffs will be able to

vote under S.B. 824. However, Legislative Defendants fundamentally miss the

point—and, indeed, the substantial right that would be lost absent appeal. “In

decision after decision, [the United States Supreme] Court has made clear that a

citizen has a constitutionally protected right to participate in elections on an equal

basis with other citizens in the jurisdiction.” Dunn v. Blumstein, 405 U.S. 330, 336,

31 L. Ed. 2d 274, 280 (1972) (emphasis added) (citations omitted). Thus, where

Plaintiffs have sufficiently alleged, as discussed in more detail infra, S.B. 824 denies

Plaintiffs the “right to participate in elections on an equal basis with other citizens

 - 10 -
 HOLMES V. MOORE

 Opinion of the Court

in [North Carolina]” because S.B. 824’s restrictions, which were enacted with

discriminatory intent, disproportionately impact African American voters’—and thus

Plaintiffs’—ability to vote in comparison to white voters, Plaintiffs have

demonstrated a substantial right that will be lost absent immediate appeal. Id.

(citations omitted); see also League of Women Voters of N.C. v. North Carolina, 769

F.3d 224, 229-30 (4th Cir. 2014) (addressing an interlocutory appeal from a district

court’s denial of a preliminary injunction where the plaintiffs challenged H.B. 589,

North Carolina’s previous voter-ID-requirement law, on the grounds that it violated

equal protection provisions of the United States Constitution). This is so because it

is the right to participate in elections on an equal basis that is substantial;

accordingly, whether Plaintiffs could conceivably still participate in the elections—by

jumping through the allegedly discriminatory hoops of S.B. 824—is, in and of itself,

not determinative of whether or not S.B. 824 negatively affects the substantial right

claimed by Plaintiffs in this case.4

 4 In a similar vein, Legislative Defendants assert for these same reasons—i.e., Plaintiffs could
still vote under S.B. 824—that Plaintiffs necessarily lack standing to challenge S.B. 824 because they
have “shown no likelihood of harm.” However, just as with the substantial-right analysis, Legislative
Defendants again miss the mark regarding Plaintiffs’ alleged actual injury, which is the
discriminatory burdens S.B. 824 imposes on Plaintiffs’ right to participate in elections on an equal
basis. See, e.g., Fla. Gen. Contractors v. Jacksonville, 508 U.S. 656, 666, 124 L. Ed. 2d 586, 597 (1993)
(explaining in the context of an equal protection claim, the “injury in fact” was the “denial of equal
treatment . . . not the ultimate inability to obtain the benefit” (citation omitted)). Here, Plaintiffs’
alleged injury in fact is the denial of equal treatment regarding Plaintiffs’ ability to comply with S.B.
824’s requirements, which Plaintiffs’ have sufficiently alleged were enacted with discriminatory intent
and disproportionately impact African Americans. That Plaintiffs may ultimately be able to vote in
accordance with S.B. 824’s requirements is not determinative of whether compliance with S.B. 824’s
commands results in an injury to Plaintiffs.

 - 11 -
 HOLMES V. MOORE

 Opinion of the Court

 Lastly, on 31 December 2019, a federal district court granted a preliminary

injunction enjoining, inter alia, S.B. 824’s voter-ID provisions, concluding the

plaintiffs in that case had satisfied their burden of showing a likelihood of success on

their claim that these provisions were impermissibly motivated, at least in part, by

discriminatory intent in violation of the Equal Protection Clause of the United States

Constitution. See N.C. State Conference of the NAACP v. Cooper, ___ F. Supp. 3d ___,

___ (M.D.N.C. 2019). At oral arguments in the present case, Legislative Defendants

argued the federal district court’s granting of a preliminary injunction divests this

Court of jurisdiction because Plaintiffs can no longer show a substantial right that

will be lost given the fact that an injunction will remain in place at least through the

March primaries.

 However, the federal district court’s injunction is merely temporary, and the

timing of any trial and decision on the merits in either the state or federal litigation

is uncertain. Moreover, Plaintiffs’ Discriminatory-Intent Claim here solely invokes

protections under our state Constitution. See Evans v. Cowan, 122 N.C. App. 181,

183-84, 468 S.E.2d 575, 577 (requiring our state courts to make an “independent

determination” of a plaintiff’s claims under the North Carolina Constitution (citations

omitted)), aff’d per curiam, 345 N.C. 177, 477 S.E.2d 926 (1996). Therefore, we

conclude this Court has jurisdiction to address the merits of Plaintiffs’ appeal from

the denial of the Preliminary-Injunction Motion.

 - 12 -
 HOLMES V. MOORE

 Opinion of the Court

 Issue

 The sole issue on appeal is therefore whether the trial court erred in denying

Plaintiffs’ Motion to preliminarily enjoin S.B. 824’s voter-ID requirements.

 Analysis

 I. Standard of Review

 In reviewing a trial court’s order denying a preliminary injunction, our Court

has explained our standard of review:

 A preliminary injunction is an extraordinary measure taken
 by a court to preserve the status quo of the parties during
 litigation. It will be issued only (1) if a plaintiff is able to show
 likelihood of success on the merits of his case and (2) if a plaintiff
 is likely to sustain irreparable loss unless the injunction is issued,
 or if, in the opinion of the Court, issuance is necessary for the
 protection of a plaintiff’s rights during the course of litigation. In
 reviewing the denial of a preliminary injunction, an appellate
 court is not bound by the trial court’s findings of fact, but may
 weigh the evidence anew and enter its own findings of fact and
 conclusions of law; our review is de novo. De novo review requires
 us to consider the question anew, as if not previously considered
 or decided, and such a review of the denial of a preliminary
 injunction is based upon the facts and circumstances of the
 particular case.

Kennedy v. Kennedy, 160 N.C. App. 1, 8, 584 S.E.2d 328, 333 (2003) (citations and

quotation marks omitted).

 II. Discriminatory-Intent Claim

 Plaintiffs allege S.B. 824 violates the Equal Protection Clause of the North

Carolina Constitution because it intentionally discriminates against African

 - 13 -
 HOLMES V. MOORE

 Opinion of the Court

American voters. See N.C. Const. art. I, § 19 (guaranteeing “[n]o person shall be

denied the equal protection of the laws; nor shall any person be subjected to

discrimination by the State because of race, color, religion, or national origin”).5

Specifically, Plaintiffs assert S.B. 824 “is unconstitutional because it was enacted

with the discriminatory intent to exclude voters of color from the electoral process.”

 The parties generally agree the United States Supreme Court’s decision in

Arlington Heights v. Metropolitan Housing Corp. and its progeny control the question

of whether Plaintiffs are entitled to a preliminary injunction based on their

Discriminatory-Intent Claim. See 429 U.S. 252, 50 L. Ed. 2d 450 (1977).

 In [Arlington Heights], the Supreme Court addressed a claim
 that racially discriminatory intent motivated a facially neutral
 governmental action. The Court recognized that a facially
 neutral law, like the one at issue here, can be motivated by
 invidious racial discrimination. Id. at 264-66[, 50 L. Ed. 2d at
 464-65]. If discriminatorily motivated, such laws are just as
 abhorrent, and just as unconstitutional, as laws that expressly
 discriminate on the basis of race. Id.

 When considering whether discriminatory intent motivates a
 facially neutral law, a court must undertake a “sensitive inquiry
 into such circumstantial and direct evidence of intent as may be
 available.” [Id. at 266, 50 L. Ed. 2d at 465.] Challengers need not
 show that discriminatory purpose was the “sole[ ]” or even a
 “primary” motive for the legislation, just that it was “a motivating

 5 Although Plaintiffs only allege violations of our state Constitution and not the federal
Constitution, our Supreme Court has recognized the “Equal Protection Clause of Article I, § 19 of the
Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the
Fourteenth Amendment to the Constitution of the United States.” White v. Pate, 308 N.C. 759, 765,
304 S.E.2d 199, 203 (1983) (citation omitted). Accordingly, we utilize decisions under both
Constitutions to analyze the validity of Plaintiffs’ Discriminatory-Intent Claim. See, e.g., Libertarian
Party of N.C. v. State, 365 N.C. 41, 42, 707 S.E.2d 199, 200-01 (2011) (“adopt[ing] the United States
Supreme Court’s analysis for determining the constitutionality of ballot access provisions”).

 - 14 -
 HOLMES V. MOORE

 Opinion of the Court

factor.” Id. at 265-66[, 50 L. Ed. 2d at 465] (emphasis added).
Discriminatory purpose “may often be inferred from the totality
of the relevant facts, including the fact, if it is true, that the law
bears more heavily on one race than another.” [Washington v.
Davis, 426 U.S. 229, 242, 48 L. Ed. 2d 597, 608-09 (1976).] But
the ultimate question remains: did the legislature enact a law
“because of,” and not “in spite of,” its discriminatory effect. Pers.
Adm’r of Mass. v. Feeney, 442 U.S. 256, 279, [60 L. Ed. 2d 870,
888] (1979) [(footnote omitted)].

 In Arlington Heights, the Court set forth a nonexhaustive list
of factors to consider in making this sensitive inquiry. These
include: “[t]he historical background of the [challenged] decision”;
“[t]he specific sequence of events leading up to the challenged
decision”; “[d]epartures from normal procedural sequence”; the
legislative history of the decision; and of course, the
disproportionate “impact of the official action—whether it bears
more heavily on one race than another.” Arlington Heights, 429
U.S. at 266-67[, 50 L. Ed. 2d at 465-66] (internal quotation marks
omitted).

 In instructing courts to consider the broader context
surrounding the passage of legislation, the Court has recognized
that “[o]utright admissions of impermissible racial motivation are
infrequent and plaintiffs often must rely upon other evidence.” In
a vote denial case such as the one here, where the plaintiffs allege
that the legislature imposed barriers to minority voting, this
holistic approach is particularly important, for “[d]iscrimination
today is more subtle than the visible methods used in 1965.” Even
“second-generation barriers” to voting, while facially race neutral,
may nevertheless be motivated by impermissible racial
discrimination. [Shelby County v. Holder, 570 U.S. 529, 563-64,
186 L. Ed. 2d 651, 677 (2013)] (Ginsberg, J., dissenting)
(cataloguing ways in which facially neutral voting laws continued
to discriminate against minorities even after passage of Voting
Rights Act).

 “Once racial discrimination is shown to have been a
‘substantial’ or ‘motivating’ factor behind enactment of the law,
the burden shifts to the law’s defenders to demonstrate that the

 - 15 -
 HOLMES V. MOORE

 Opinion of the Court

 law would have been enacted without this factor.” [Hunter v.
 Underwood, 471 U.S. 222, 228, 85 L. Ed. 2d 222, 228 (1985)
 (citation omitted).] When determining if this burden has been
 met, courts must be mindful that “racial discrimination is not just
 another competing consideration.” Arlington Heights, 429 U.S. at
 265-66[, 50 L. Ed. 2d at 465]. For this reason, the judicial
 deference accorded to legislators when “balancing numerous
 competing considerations” is “no longer justified.” Id. Instead,
 courts must scrutinize the legislature’s actual non-racial
 motivations to determine whether they alone can justify the
 legislature’s choices. If a court finds that a statute is
 unconstitutional, it can enjoin the law.

N.C. State Conference of NAACP v. McCrory, 831 F.3d 204, 220-21 (4th Cir. 2016)

(alterations in original) (citations omitted).

 Both Defendants, however, take issue with several parts of this analysis and

suggest differing standards should apply. First, Legislative Defendants, citing

Arlington Heights, argue that for Plaintiffs to carry their burden of proving S.B. 824

is racially discriminatory, “Plaintiffs must prove both racially discriminatory impact

and ‘racially discriminatory intent or purpose.’ ” Whereas, State Defendants contend

that because Plaintiffs raise a facial challenge to S.B. 824, which generally requires

a showing that “there are no circumstances under which the statute might be

constitutional” to prevail, quoting N.C. State Bd. of Educ. v. State, 371 N.C. 170, 180,

814 S.E.2d 67, 74 (2018) (citation and quotation marks omitted), and because we must

presume S.B. 824, a North Carolina statute, is constitutional and therefore afford it

“great deference,” quoting Rhyne v. K-Mart Corp., 358 N.C. 160, 167, 594 S.E.2d 1, 7

(2004) (citation and quotation marks omitted), “Plaintiffs must show that it is

 - 16 -
 HOLMES V. MOORE

 Opinion of the Court

impossible to enforce [S.B.] 824 in a way that does not discriminate against voters

based on race” in order to succeed on the merits. However, both Defendants

misinterpret Plaintiffs’, and their own, burden under a challenge, such as this, to a

facially neutral law allegedly motivated by a discriminatory purpose.

 First, Legislative Defendants misconstrue the initial burden under the burden-

shifting framework established by Arlington Heights, which first requires “[p]roof of

racially discriminatory intent or purpose . . . to show a violation of the Equal

Protection Clause.” 429 U.S. at 265, 50 L. Ed. 2d at 464. To aid in this task, Arlington

Heights provides a list of nonexhaustive factors for courts to consider, and one of those

factors is the disproportionate “impact of the official action—whether it bears more

heavily on one race than another[, i.e., discriminatory impact.]” Id. at 266, 50 L. Ed.

2d at 465 (citation and quotation marks omitted). Stated another way, discriminatory

impact can support an inference of discriminatory intent or purpose; however, only

“discriminatory intent or purpose is required to show a violation of the Equal

Protection Clause.” Id. at 265, 50 L. Ed. 2d at 464 (emphasis added); see also Davis,

426 U.S. at 242, 48 L. Ed. 2d at 608-09 (holding discriminatory intent or purpose

“may often be inferred from the totality of the relevant facts, including the fact, if it

is true, that the law bears more heavily on one race than another” (emphasis added)).6

 6 Legislative Defendants’ argument rests almost entirely on the United States Supreme
Court’s pronouncement in Palmer v. Thompson—“[N]o case in this Court has held that a legislative
act may violate equal protection solely because of the motivations of the men who voted for it.” 403

 - 17 -
 HOLMES V. MOORE

 Opinion of the Court

 Second, State Defendants misunderstand the presumptions, or lack thereof,

afforded to the law’s defenders at the second stage of the Arlington Heights analysis.

“Once racial discrimination is shown to have been a ‘substantial’ or ‘motivating’ factor

behind enactment of the law, the burden shifts to the law’s defenders to demonstrate

that the law would have been enacted without this factor.” Hunter, 471 U.S. at 228,

85 L. Ed. 2d at 228 (citation omitted). Although State Defendants correctly point out

North Carolina caselaw generally “gives acts of the General Assembly great

deference,” Rhyne, 358 N.C. at 167, 594 S.E.2d at 7 (citation and quotation marks

omitted), such deference is not warranted when the burden shifts to a law’s defender

after a challenger has shown the law to be the product of a racially discriminatory

purpose or intent. See Arlington Heights, 429 U.S. at 265-66, 50 L. Ed. 2d at 465

(“When there is proof that a discriminatory purpose has been a motivating factor in

the decision, . . . judicial deference is no longer justified.” (emphasis added) (footnote

U.S. 217, 224, 29 L. Ed. 2d 438, 444 (1971). We first note Palmer was decided before both Davis and
Arlington Heights and that both decisions seem to nullify Palmer’s pronouncement. Furthermore,
although the Supreme Court has never expressly overturned Palmer, the Eleventh Circuit has
previously noted the decision’s “holding simply has not withstood the test of time, even in the
Fourteenth Amendment equal protection context.” Church of Scientology v. City of Clearwater, 2 F.3d
1514, 1529 (11th Cir. 1993) (citations omitted). In any event and as discussed infra, Plaintiffs have
sufficiently alleged some disproportionate impact caused by S.B. 824, which is sufficient, along with
the presence of the other Arlington Heights factors, to support a showing of discriminatory intent
under Arlington Heights’s totality-of-the-circumstances test. See McCrory, 831 F.3d at 231 (“Showing
disproportionate impact, even if not overwhelming impact, suffices to establish one of the
circumstances evidencing discriminatory intent.” (footnote omitted)).

 - 18 -
 HOLMES V. MOORE

 Opinion of the Court

omitted)).7 Accordingly, the general standard applied to facial constitutional

challenges is also inapplicable because the Arlington Heights framework dictates the

law’s defenders must instead “demonstrate that the law would have been enacted

without” the alleged discriminatory intent. Hunter, 471 U.S. at 228, 85 L. Ed. 2d at

228 (citation omitted).

 Therefore, we apply the framework created by Arlington Heights and

succinctly summarized by McCrory. Accordingly, we turn to the Arlington Heights

factors to determine whether Plaintiffs have shown—at this preliminary stage on the

current Record—a likelihood of prevailing on the merits of their Discriminatory-

Intent Claim.

 A. Historical Background

 Under Arlington Heights, a court reviewing a discriminatory-intent claim

should consider “[t]he historical background of the decision” challenged as racially

discriminatory. 429 U.S. at 267, 50 L. Ed. 2d at 465 (citations omitted). “A historical

pattern of laws producing discriminatory results provides important context for

 7 In this sense, Arlington Heights’s burden-shifting framework is congruent with our Supreme
Court’s “strong presumption that acts of the General Assembly are constitutional[.]” Stephenson v.
Bartlett, 355 N.C. 354, 362, 562 S.E.2d 377, 384 (2002) (citations omitted). Under an Arlington Heights
analysis, a plaintiff must first show discriminatory intent motivated the challenged act, and once this
initial burden has been overcome, “judicial deference is no longer justified.” 429 U.S. at 265-66, 50 L.
Ed. 2d at 465 (footnote omitted). Similarly, although under our caselaw we initially afford a “strong
presumption” in favor of a law’s constitutionality, this presumption nevertheless can be overcome, at
which point deference is likewise not warranted. See Stephenson, 355 N.C. at 362, 562 S.E.2d at 384
(“Although there is a strong presumption that acts of the General Assembly are constitutional, it is
nevertheless the duty of this Court, in some instances, to declare such acts unconstitutional.” (emphasis
added) (citations omitted)).

 - 19 -
 HOLMES V. MOORE

 Opinion of the Court

determining whether the same decisionmaking body has also enacted a law with

discriminatory purpose.” McCrory, 831 F.3d at 223-24 (citation omitted). As the

McCrory Court stated: “Examination of North Carolina’s history of race

discrimination and recent patterns of official discrimination, combined with the racial

polarization of politics in the state, seems particularly relevant in this inquiry.” Id.

at 223.

 Both the United States Supreme Court and the Fourth Circuit have recently

summarized the historical context in which this case arises. See Shelby Cty., 570 U.S.

at 552, 186 L. Ed. 2d at 670; McCrory, 831 F.3d at 223-25. As Shelby County

recognized, “[i]t was in the South that slavery was upheld by law until uprooted by

the Civil War, that the reign of Jim Crow denied African-Americans the most basic

freedoms, and that state and local governments worked tirelessly to disenfranchise

citizens on the basis of race.” 570 U.S. at 552, 186 L. Ed. 2d at 670. Just as with

other states in the South, “North Carolina has a long history of race discrimination

generally and race-based vote suppression in particular.” McCrory, 831 F.3d at 223.

 To help combat this “extraordinary problem” and ensure African Americans

and other minorities the right to vote, Congress enacted the Voting Rights Act of 1965

(VRA). Shelby Cty., 570 U.S. at 534, 186 L. Ed. 2d at 659. Under the VRA, Congress

“required [certain] States to obtain federal permission before enacting any law

related to voting[.]” Id. at 535, 186 L. Ed. 2d at 659. In order to obtain “preclearance,”

 - 20 -
 HOLMES V. MOORE

 Opinion of the Court

the State had to demonstrate that their proposed legislation “had neither the purpose

nor effect of diminishing the ability of any citizens to vote on account of race or color.”

McCrory, 831 F.3d at 215 (citation and quotation marks omitted). “Forty North

Carolina jurisdictions were covered under” this preclearance regime. Id. (citation

omitted). “During the period in which North Carolina jurisdictions were [subjected

to preclearance], African American electoral participation dramatically improved.”

Id.8 “After years of preclearance and expansion of voting access, by 2013 African

American registration and turnout rates had finally reached near-parity with white

registration and turnout rates.” Id. at 214.

 The General Assembly’s first attempt at a photo-ID law began in 2011. While

still subject to preclearance, the General Assembly passed a photo-ID law along strict

party lines; however, then-Governor Beverly Perdue vetoed the proposed bill. In her

statement accompanying her veto, then-Governor Perdue expressed concern that the

“bill, as written, will unnecessarily and unfairly disenfranchise many eligible and

legitimate voters.” Approximately two years later, the General Assembly again began

discussions of another photo-ID law—House Bill 589 (H.B. 589). See id. at 227. In

 8 In addition to preclearance, challenges to various election laws in North Carolina have also
aided in creating more favorable voting conditions for African Americans. For instance, from 1980 to
2013, the Department of Justice “issued over fifty objection letters to proposed election law changes in
North Carolina . . . because the State had failed to prove the proposed changes would have no
discriminatory purpose or effect.” Id. at 224 (citations omitted). “During the same period, private
plaintiffs brought fifty-five successful cases under [the VRA, resulting in t]en cases end[ing] in judicial
decisions finding that electoral schemes . . . across the state had the effect of discriminating against
minority voters.” Id. (citations omitted). “Forty-five cases were settled favorably for plaintiffs out of
court or through consent [decrees] that altered the challenged voting laws.” Id. (citations omitted).

 - 21 -
 HOLMES V. MOORE

 Opinion of the Court

its initial form, H.B. 589’s photo-ID requirements were “much less restrictive” than a

later version passed after the United States Supreme Court’s decision in Shelby

County. Id.; see also Shelby Cty., 570 U.S. at 529, 186 L. Ed. 2d at 651. Indeed, the

pre-Shelby County version of H.B. 589 included several types of acceptable IDs—such

as community college IDs; public-assistance IDs; and federal, state, and local

government IDs—that were either removed or limited in the final versions of both

H.B. 589 and S.B. 824. Compare H.B. 589 (5th ed.), § 4 (N.C. 2013), with 2013 N.C.

Sess. Law 381, § 2.1 (N.C. 2013), and 2018 N.C. Sess. Law 144, § 1.2(a).

 On 25 June 2013, the United States Supreme Court issued its opinion in Shelby

County, which invalidated the preclearance coverage formula and meant “North

Carolina no longer needed to preclear changes in its election laws.” McCrory, 831

F.3d at 216. In response, the General Assembly “requested and received racial data”

on the various voting practices within the state and on the types of IDs commonly

possessed by its citizenry. Id. at 216 (citation omitted). With this racial data in hand,

the General Assembly “swiftly expanded an essentially single-issue bill into omnibus

legislation[.]” Id. (footnote omitted). The result, as described by the Fourth Circuit,

was a bill that, inter alia, “exclude[d] many of the alternative photo IDs used by

African Americans” and “eliminated or reduced registration and voting access tools

that African Americans disproportionately used.” Id. (citations omitted). H.B. 589

was “quickly ratified . . . by strict party-line votes . . . [, and t]he Governor, who was

 - 22 -
 HOLMES V. MOORE

 Opinion of the Court

of the same political party as the party that controlled the General Assembly,

promptly signed the bill into law on August 12, 2013.” Id. at 218 (citations omitted).

 Legal challenges to H.B. 589 quickly ensued, alleging the law was “motivated

by discriminatory intent” in violation of, inter alia, the Fourteenth Amendment’s

Equal Protection Clause. Id. (citation omitted). In McCrory, the Fourth Circuit

recognized that voting in North Carolina, both historically and currently, is “racially

polarized”—i.e., “the race of voters correlates with the selection of a certain candidate

or candidates.” Id. at 214 (citation and quotation marks omitted) (noting African

American voters overwhelmingly support Democratic candidates). Such polarization

offers a “political payoff for legislators who seek to dilute or limit the minority vote.”

Id. at 222. McCrory noted the historical background evidence of H.B. 589 suggested

racial polarization played an important role in the enactment of H.B. 589, which

“target[ed] African Americans with almost surgical precision[.]” Id. at 214, 226.

 In light of the historical background of the law, the “hurried pace” with which

H.B. 589 was enacted after being relieved of preclearance requirements, the

legislature’s use of racial data in crafting H.B. 589, and the recent surge in African

American voting power, the McCrory Court concluded, in enacting H.B. 589, the

Republican-controlled General Assembly “unmistakably” sought to “entrench itself

. . . by targeting voters who, based on race, were unlikely to vote for the majority

party.” Id. at 223-33. Accordingly, the Fourth Circuit struck down H.B. 589 as

 - 23 -
 HOLMES V. MOORE

 Opinion of the Court

unconstitutional, recognizing the “General Assembly enacted the challenged

provisions of [H.B. 589] with discriminatory intent.” Id. at 215.

 In accordance with McCrory, the “important takeaway” from this historical

background is “that state officials continued in their efforts to restrict or dilute

African American voting strength well after 1980 and up to the present day.” Id. at

225. Further, these cases “highlight the manner in which race and party are

inexorably linked in North Carolina[,]” which, according to the Fourth Circuit,

“constitutes a critical—perhaps the most critical—piece of historical evidence here.”

Id. As McCrory recognized, racial polarization—which creates an “incentive for

intentional discrimination in the regulations of elections”—existed in 2013 and

played a key role in the General Assembly’s decision to enact H.B. 589. Id. at 222.

The proposed constitutional Amendment, and subsequently S.B. 824, followed on the

heels of the McCrory decision with little or no evidence on this Record of any change

in this racial polarization.9 More to the point, Plaintiffs’ evidence tends to show

legislators relied on the same data in enacting S.B. 824 as they did in enacting H.B.

589. Accordingly, the historical context in which S.B. 824 was enacted provides

support for Plaintiffs’ Discriminatory-Intent Claim and warrants further scrutiny of

the intent behind S.B. 824.

 9 The Middle District of North Carolina, in its order preliminarily enjoining S.B. 824, actually
found “the evidence still shows that the state’s electorate was extremely polarized at the time S.B. 824
was enacted and will predictably remain so in the near future[.]” Cooper, ___ F. Supp. 3d at ___
(citation omitted).

 - 24 -
 HOLMES V. MOORE

 Opinion of the Court

 B. Sequence of Events

 Arlington Heights also directs a court reviewing a discriminatory-intent

challenge to consider the “specific sequence of events leading up to the challenged

decision[.]” 429 U.S. at 267, 50 L. Ed. 2d at 466 (citations omitted). “In doing so, a

court must consider departures from the normal procedural sequence, which may

demonstrate that improper purposes are playing a role.” McCrory, 831 F.3d at 227

(alteration, citation, and quotation marks omitted). These considerations “may shed

some light on the decisionmaker’s purposes.” Arlington Heights, 429 U.S. at 267, 50

L. Ed. 2d at 466 (citation omitted).

 Here, Plaintiffs contend the “unusual sequence of events leading to the passage

[of S.B.] 824 support the inference that it was motivated by an improper

discriminatory intent.” In support of this contention, Plaintiffs point to the testimony

in an affidavit of Representative Mary Price “Pricey” Harrison (Representative

Harrison) summarizing the legislative process of S.B. 824:

 8. I also believe that the legislative process leading to the
 enactment of [S.B.] 824 deviated significantly from proper
 substantive and procedural legislative practices. The
 legislative process for [S.B.] 824 followed an abbreviated and
 inadequately-deliberative pattern that the General Assembly
 has only in recent years seemed to have adopted for
 controversial legislation. Instead of allowing for a proper and
 thorough debate, the legislative process was truncated.

 9. Though North Carolinians approved the ID constitutional
 amendment in November 2018, mandating voters to show
 identification upon voting, voters also expressed a desire to

 - 25 -
 HOLMES V. MOORE

 Opinion of the Court

 see significant changes in the General Assembly.
 Republicans lost their veto-proof supermajorities in both the
 State House and Senate during the 2018 midterm.

10. Yet, instead of allowing newly elected officials to craft
 enabling legislation in accordance with the approved ID
 constitutional amendment once they took office, the lame-
 duck legislature reconvened the 2017-2018 Session in late
 November of 2018 to take up the task. Legislative leaders
 expedited the passage of [S.B.] 824 rather than taking the
 time to ensure the protections of voters’ constitutional rights.
 Consequently, the General Assembly enacted enabling
 legislation affecting over 7 million registered North Carolina
 voters—overrode a gubernatorial veto of that legislation—in
 just over 21 days.

11. Consideration of the enabling legislation for the
 constitutional amendment began on November 27, 2018 and
 [S.B.] 824 passed the North Carolina House by a vote of 67-
 40 on December 5, 2018. Over a span of only 8 days—with
 only limited debate and outdated data to inform legislative
 decisions—the General Assembly enacted enabling
 legislation impacting millions of North Carolinians for years
 to come.

12. Because of the legislature’s failure to consider public input,
 failure to use updated data, failure to allow a thorough
 debate, and failure to take into account all implications of the
 bill’s potential impacts on voters, it is my belief that [S.B.]
 824 as passed fails to sufficiently balance the need to
 legislatively implement the ID constitutional amendment
 with the need to preserve all other rights that the North
 Carolina Constitution affords.

13. Specifically, the House failed to give adequate notice of the
 meeting to discuss the proposed language for [S.B.] 824, and
 circulated the proposed language only the night before its
 consideration. Several House members, including myself,
 had to arrange last minute travel back to Raleigh and cancel

 - 26 -
 HOLMES V. MOORE

 Opinion of the Court

 other scheduled events and meetings in order to attend the
 Session.

14. Further, public comment was limited to allow only 30
 individuals to speak on the proposed bill. Such a limitation
 deviates from typical procedure for a bill of this magnitude
 that relates to fundamental constitutional rights. In my
 experience, with regard to bills of this magnitude that affect
 issues such as voting rights or redistricting, the legislature
 has provided much more opportunity for lengthy and
 balanced public comment. In this instance, only a few
 individuals had the opportunity to speak in opposition to the
 proposed bill. Again, this is a deviation from standard
 procedure.

15. In my experience, it is a deviation from normal procedure to
 limit discussion of a bill of this magnitude to just a few hours.
 The scope of [S.B.] 824 necessitated a significantly extended
 timeline in order to properly understand its far-reaching
 implications on the ability of North Carolina citizens to vote.

16. Given the expedited timeline that the General Assembly
 pursued in passing [S.B.] 824, there was no opportunity—as
 would be available during a normal legislative process—to
 access relevant and critical data regarding voter information.
 It is my understanding that much of the data available to us
 was outdated. As such, the particulars of [S.B.] 824 fail to
 accurately reflect the current state of voter specific
 information in North Carolina.

17. Legislators were presented with data from 2015 for their
 consideration when enacting [S.B.] 824, rather than more
 appropriate, up-to-date figures. For example, the General
 Assembly was presented with significantly outdated “no-
 match” data demonstrating how many North Carolina voters
 lacked photo ID as of 2015, and to my knowledge did not even
 attempt to ascertain how many voters lacked such ID at the
 time [S.B.] 824 was on the floor for discussion.

 - 27 -
 HOLMES V. MOORE

 Opinion of the Court

 18. By contrast, the General Assembly was made aware of data—
 through a presentation delivered to the Joint Legislative
 Elections Oversight Committee—that showed [S.B.] 824
 would disenfranchise thousands of voters. Nevertheless, the
 General Assembly enacted [S.B.] 824.

 In response, Defendants assert there was nothing unusual about this process

because the General Assembly followed its normal protocol in passing S.B. 824. For

instance, Senator Joel Ford (Senator Ford) countered it was “not unusual or a

departure from the normal political process for the General Assembly to reconvene

its 2017-2018 Regular Session to consider” S.B. 824. Senator Ford further iterated

the enactment of “S.B. 824 followed a normal legislative process” and that the General

Assembly “followed all of its normal rules and procedures in considering and enacting

S.B. 824.” He also stated the timeframe of its passage and the fact that a “lame-duck

legislature” passed the legislation were both “not unusual[.]” However, “a legislature

need not break its own rules to engage in unusual procedures.” McCrory, 831 F.3d at

228.

 Specifically, here, as Plaintiffs point out, sixty-one of the legislators who voted

in favor of S.B. 824 had previously voted to enact H.B. 589, which was struck down

by the Fourth Circuit as motivated by a discriminatory intent. We acknowledge

individual legislator’s views and motivations can change. However, “discriminatory

intent does tend to persist through time[.]” United States v Fordice, 505 U.S. 717,

747, 120 L. Ed. 2d 575, 604 (1992) (Thomas, J., concurring) (citation omitted).

 - 28 -
 HOLMES V. MOORE

 Opinion of the Court

Therefore, given the “initially tainted policy of [H.B. 589], it is eminently reasonable

to make the [General Assembly] bear the risk of nonpersuasion with respect to intent

at some future time[.]” Id. at 746, 120 L. Ed. 2d at 604 (citation omitted).

 Also persuasive is the fact S.B. 824 was passed in a short timeframe by a lame-

duck-Republican supermajority, especially given Republicans would lose their

supermajority in 2019 because of seats lost during the 2018 midterm election. At a

minimum, this shows an intent to push through legislation prior to losing

supermajority status and over the governor’s veto. Moreover, the quick passage of

S.B. 824 was undertaken with limited debate and public input and without further

study of the law’s effects on minority voters—notwithstanding the fact H.B. 589 had

been recently struck down. Plaintiffs’ forecasted evidence demonstrates a number of

amendments seeking to ameliorate the impacts of S.B. 824 were also summarily

rejected. Thus, Plaintiffs have made a sufficient preliminary showing that even if the

General Assembly followed its rules, the process employed in enacting S.B. 824 was

nevertheless unusual. See McCrory, 831 F.3d at 229.

 C. Legislative History

 Indeed, Arlington Heights specifically recognizes that legislative history

leading to a challenged law “may be highly relevant [to the question of discriminatory

intent], especially where there are contemporary statements by members of the

decisionmaking body, minutes of its meetings, or reports.” 429 U.S. at 268, 50 L. Ed.

 - 29 -
 HOLMES V. MOORE

 Opinion of the Court

2d at 466. Here, given the lack of a fully developed record at this preliminary-

injunction stage, our review of the legislative history is somewhat limited. However,

a few observations about S.B. 824’s legislative history provide important context to

our analysis, further supporting Plaintiffs’ claim that discriminatory intent was a

motivating factor behind the passage of S.B. 824.

 When debating and enacting S.B. 824, the General Assembly neither requested

nor received any new, updated data showing the percentages of likely voters who

possessed qualifying IDs under S.B. 824. Instead, Plaintiffs have presented evidence

showing the General Assembly relied on outdated data from 2015 “rather than

seeking out more recent information so as to better understand the implications of

[S.B.] 824.” In addition, Senator Mike Woodard (Senator Woodard) alleged “the

expedited timeline that the General Assembly pursued in passing [S.B.] 824 failed to

provide the opportunity—as would be available during a normal legislative process—

to access relevant and critical data regarding voter information.” Senator Woodard

suggested because of “this unnecessarily rushed legislative process that failed to

account for the full scope of relevant information[,]” S.B. 824 will likely disenfranchise

North Carolina voters.

 Further, McCrory recognized, as particularly relevant to its discriminatory-

intent analysis, “the removal of public assistance IDs in particular was suspect,

because a reasonable legislator . . . could have surmised that African Americans

 - 30 -
 HOLMES V. MOORE

 Opinion of the Court

would be more likely to possess this form of ID.” 831 F.3d at 227-28 (citation and

quotation marks omitted). According to Representative Harrison’s affidavit, an

amendment to S.B. 824 that “would have enabled the recipients of federal and state

public assistance to use their public assistance IDs for voting purposes . . . [was] also

rejected.” Representative Harrison’s affidavit states Representative David Lewis

(Representative Lewis) rejected this amendment on the basis “the General Assembly

does not have the ability to impose its standards on the federal government[.]”

However, “Representative Lewis [also] acknowledged that the same is true for

military IDs, [which were] nonetheless included as an acceptable form of photo ID.”

Defendants counter their proffered reason for not including public-assistance IDs was

because they do not always include photographs. However, in light of the express

language in McCrory and at this stage of the proceeding, the inference remains the

failure to include public-assistance IDs was motivated in part by the fact that these

types of IDs were disproportionately possessed by African American voters.

 Accordingly, at this stage of the proceeding, Plaintiffs have presented some

evidence suggesting the General Assembly refused to obtain updated data on the

effects of S.B. 824’s voter-ID provisions, instead relying on outdated data from 2015,

and chose not to include certain types of ID disproportionately held by African

Americans. When viewed in context, this legislative history supports Plaintiffs’ claim

of an underlying motive of discriminatory intent in the enactment of S.B. 824. See

 - 31 -
 HOLMES V. MOORE

 Opinion of the Court

id. at 230 (recognizing “the choices the General Assembly made with this [racial] data

in hand” suggested a discriminatory intent where the General Assembly excluded

types of IDs disproportionately possessed by African Americans).

 D. Impact of the Official Action

 Further, “Arlington Heights instructs that courts also consider the ‘impact of

the official action’—that is, whether ‘it bears more heavily on one race than another.’ ”

Id. (quoting Arlington Heights, 429 U.S. at 266, 50 L. Ed. 2d at 465). On this fourth

Arlington Heights factor, the McCrory Court stated:

 When plaintiffs contend that a law was motivated by
 discriminatory intent, proof of disproportionate impact is not the
 sole touchstone of the claim. Rather, plaintiffs asserting such
 claims must offer other evidence that establishes discriminatory
 intent in the totality of the circumstances. Showing
 disproportionate impact, even if not overwhelming impact,
 suffices to establish one of the circumstances evidencing
 discriminatory intent.

Id. at 231 (footnote, citations, and quotation marks omitted).

 Here, in support of a showing of disparate impact, Plaintiffs point to the

affidavit of their expert witness, Professor Kevin Quinn (Professor Quinn). In his

affidavit, Professor Quinn explained his task was “to examine North Carolinians’

possession rates of forms of photo identification that comply with the requirements

of [S.B.] 824 (“acceptable ID”) and to determine whether changes in the voter ID

requirement disproportionately impact certain types of North Carolina voters.” To

aid in this task, Professor Quinn analyzed data from 2014 used in crafting H.B. 589—

 - 32 -
 HOLMES V. MOORE

 Opinion of the Court

contained in a report he created in 2015—because no data on all 2019 ID-possession

rates existed, although he did have some data on voter registration in 2019. Professor

Quinn averred: “Given the data available to me now, my expert opinion is that the

rates of photo ID possession by race and active/inactive status that I documented in

my 2015 report remain accurate estimates of the corresponding rates of photo ID

possession in 2019.” “In 2015, African Americans were more than twice as likely as

whites to lack identification required to vote under [H.B.] 589.” After looking at the

changes between acceptable IDs under H.B. 589 and S.B. 824, Professor Quinn

opined, “given the information available at this time, that the differences that do exist

are unlikely to have an appreciable effect on the racial disparities in ID possession

that I found in my 2015 analysis.” Accordingly, Professor Quinn stated S.B. 824

would still have a disproportional impact on African Americans because this class

lacks acceptable IDs at a greater rate than white voters. As McCrory explained, such

a “[s]howing of disproportionate impact, even if not overwhelming impact, suffices to

establish one of the circumstances evidencing discriminatory intent.” 831 F.3d at 231

(emphasis added) (footnote omitted). We also note, as the dissenting judge below

recognized, the General Assembly’s decision to exclude public-assistance and federal-

government-issued IDs will likely have a negative effect on African Americans

because such types of IDs are “disproportionately held by African Americans.” Id. at

236 (citation omitted).

 - 33 -
 HOLMES V. MOORE

 Opinion of the Court

 Defendants, however, counter by pointing to the fact that under S.B. 824 all

voters can obtain a photo ID free of charge or alternatively cast a provisional ballot

under the reasonable-impediment provision, contending these ameliorating

provisions remedy any disproportionate impact caused by the photo-ID requirements.

It is true that S.B. 824 allows a registered voter to visit their county board of elections

and receive an ID “without charge” so long as the voter provides their name, date of

birth, and the last four digits of their social security number. 2018 N.C. Sess. Law

144, § 1.1(a).

 Plaintiffs, however, presented evidence showing the burdens of obtaining a free

ID are “significant . . . [and] fall disproportionately on voters of color.” For instance,

Noah Read (Read), a member of the Alamance County Board of Elections, stated in

his affidavit: “Because of the location and lack of transportation to the [County Board

of Elections] office, I think that providing free Voter IDs . . . will do little to make it

easier for Alamance County citizens who do not have ID from the DMV to obtain a

free ID for voting.” The Chair of the Lenoir County Board of Elections expressed

similar concerns that those without access to public transportation could not obtain

a free ID in Lenoir County. As Plaintiffs allege, those who lack public transportation

or the means to travel are generally working class and poor voters. Plaintiffs also

presented evidence showing African Americans in North Carolina are

disproportionately more likely to live in poverty than white citizens. Accordingly,

 - 34 -
 HOLMES V. MOORE

 Opinion of the Court

Plaintiffs’ evidence at this stage shows the availability of free IDs does little to

alleviate the additional burdens of S.B. 824 where African Americans

disproportionately lack the resources to travel and acquire such IDs in comparison to

white voters.

 As for the reasonable-impediment provision, S.B. 824 allows a voter who lacks

qualifying ID to cast a provisional ballot if the voter completes an affidavit under

penalty of perjury affirming their identity and identifying their reasonable

impediment. 2018 N.C. Sess. Law 144, § 1.2(a). S.B. 824 provides the following types

of reasonable impediments:

 (1) Inability to obtain photo identification due to:

 a. Lack of transportation.

 b. Disability or illness.

 c. Lack of birth certificate or other underlying documents
 required.

 d. Work schedule.

 e. Family responsibilities.

 (2) Lost or stolen photo identification.

 (3) Photo identification applied for but not yet received by the
 registered voter voting in person.

 (4) Other reasonable impediment. If the registered voter checks
 the “other reasonable impediment” box, a further brief
 written identification of the reasonable impediment shall be

 - 35 -
 HOLMES V. MOORE

 Opinion of the Court

 required, including the option to indicate that State or federal
 law prohibits listing the impediment.

Id. Once submitted, the voter may cast a provisional ballot that the county board of

elections “shall find . . . is valid unless the [five-member, bipartisan] county board has

grounds to believe the affidavit is false.” Id. Defendants allege this reasonable-

impediment provision renders S.B. 824 constitutional because it allows all voters to

vote.

 While it may be true that African American voters without a qualifying ID

could still be able to vote by using the reasonable-impediment provision, this fact does

not necessarily fully eliminate the disproportionate impact on African American

voters resulting from both S.B. 824’s voter-ID provisions and the reasonable-

impediment provision. As Plaintiffs have shown, the voter-ID provisions likely will

have a negative impact on African Americans because they lack acceptable IDs at a

greater rate than white voters. Accordingly, it follows African American voters will

also then have to rely on the reasonable-impediment provision more frequently than

white voters. Although the reasonable-impediment provision casts a wide net in

defining the types of reasonable impediments that qualify under the law, which

Defendants contend will result in almost every reason for lacking an acceptable ID to

constitute a reasonable impediment, a voter using this provision must still undertake

the additional task of filling out the reasonable-impediment form and submitting an

affidavit verifying its veracity to cast a provisional ballot, which is subject to rejection

 - 36 -
 HOLMES V. MOORE

 Opinion of the Court

if the county board believes the voter’s affidavit and reasonable impediment are false.

See id. Although Defendants assert these additional steps to vote are not overly

burdensome, the use of the reasonable-impediment provision is still one more

obstacle to voting, which Plaintiffs have shown will be an obstacle that African

Americans will have to overcome at a rate higher than white voters, given their

disproportionately lower rates of possessing qualifying IDs. Accordingly, even though

at this stage the evidence shows it is “not [an] overwhelming impact,” the reasonable-

impediment provision nevertheless suffices as a “[s]howing [of] disproportionate

impact,” establishing another circumstance evidencing discriminatory intent.

McCrory, 831 F.3d at 231 (footnote omitted).

 Defendants also cite to several federal court decisions upholding similar voter-

ID laws, some of which contain comparable reasonable-impediment provisions. See,

e.g., Lee v. Virginia State Bd. of Elections, 843 F.3d 592, 594 (4th Cir. 2016) (upholding

Virginia’s voter-ID law against both discriminatory-results and discriminatory-intent

challenges); South Carolina v. U.S., 898 F. Supp. 2d 30 (D.D.C. 2012) (preclearing

South Carolina’s updated voter-ID law, which contained a similar reasonable-

impediment provision, concluding there was no discriminatory retrogressive effect or

discriminatory purpose). However, these decisions are distinguishable from the

present case and in many ways inapplicable given the different claims brought by

Plaintiffs in this case.

 - 37 -
 HOLMES V. MOORE

 Opinion of the Court

 For instance, the fact that a three-judge panel precleared South Carolina’s

voter-ID law is inapplicable to Plaintiffs’ claim here because the standard for

obtaining preclearance under Section Five of the VRA requires the state to prove the

proposed changes neither have the purpose nor effect of denying or abridging the

right to vote on account of race. See South Carolina, 898 F. Supp. 2d at 33 (citation

omitted). In this regard, the analysis under the effects test of Section Five is similar

to a discriminatory-results analysis under Section Two of the VRA, which requires a

greater showing of disproportionate impact than a discriminatory-intent claim. See

McCrory, 831 F.3d at 231 n.8.10 Accordingly, South Carolina’s analysis is

inapplicable to our discriminatory-intent analysis of S.B. 824.

 In addition, the facts of Lee are markedly different than the present. When

analyzing the plaintiffs’ discriminatory-intent claim against Virginia’s voter-ID law,

the Fourth Circuit contrasted the passage of Virginia’s law against the facts in

McCrory and observed “the legislative process contained no events that would ‘spark

suspicion[,]’ ” the Virginia legislature did not depart from the normal legislative

process and allowed “full and open debate[,]” the legislature did not use racial data

 10 Under the legislative-purpose prong of Section Five, the South Carolina Court utilized a
limited Arlington Heights analysis and determined South Carolina’s voter-ID law was not enacted
with a discriminatory purpose. 898 F. Supp. 2d at 46. When drafting and enacting this law, the South
Carolina legislature “no doubt knew . . . that photo ID possession rates varied by race in South
Carolina.” Id. at 44. Importantly, and what distinguishes South Carolina from the present case, the
South Carolina Court noted, “critically, South Carolina legislators did not just plow ahead in the face
of the data showing a racial gap.” Id. Instead, the South Carolina legislature slowed down the process
and sought out input from both political parties to alleviate any potential discriminatory impact the
new law might create. Id. at 44-46.

 - 38 -
 HOLMES V. MOORE

 Opinion of the Court

in crafting its legislation, and the provisions of its voter-ID law did not target any

group of voters. 843 F.3d at 604 (citations omitted). Accordingly, the Lee Court held

the plaintiffs had not shown any discriminatory intent under Arlington Heights. Id.

As previously discussed, however, an analysis of S.B. 824 utilizing the Arlington

Heights factors and in light of McCrory suggests there is evidence here that

discriminatory intent was a motivating factor behind the passage of this act.

 After analyzing S.B. 824 under the Arlington Heights factors and the Record

before us, we conclude, based on the totality of the circumstances, Plaintiffs have

shown a likelihood of success on the merits in demonstrating that discriminatory

intent was a motivating factor behind enacting S.B. 824. Plaintiffs’ evidence at this

point supports this conclusion. For instance, Plaintiffs have sufficiently shown the

historical background of S.B. 824, the unusual sequence of events leading up to the

passage of S.B. 824, the legislative history of this act, and some evidence of

disproportionate impact of S.B. 824 all suggest an underlying motive of

discriminatory intent in the passage of S.B. 824. See Arlington Heights, 429 U.S. at

265-68, 50 L. Ed. 2d at 464-66.

 E. Defendants’ Proffered Nonracial Motivations

 Because Plaintiffs have adequately met their initial burden of showing S.B.

824 was likely motivated by discriminatory intent, the burden shifts to Defendants

“to demonstrate that the law would have been enacted without this factor.” McCrory,

 - 39 -
 HOLMES V. MOORE

 Opinion of the Court

831 F.3d at 221 (citation and quotation marks omitted). Because “racial

discrimination is not just another competing consideration[,]” judicial deference is “no

longer justified.” Id. (citations and quotation marks omitted). We must instead

“scrutinize the legislature’s actual non-racial motivations to determine whether they

alone can justify the legislature’s choices.” Id. (citations omitted). Defendants’ only

proffered justification for S.B. 824 is that this act was crafted and enacted to fulfill

our Constitution’s newly added mandate that North Carolinians must present ID

before voting.11 See N.C. Const. art. VI, §§ 2(4), 3(2).

 We recognize that in 2018 a majority of North Carolina voters voted in favor of

amending Article VI of the North Carolina Constitution, requiring voters in North

Carolina to present ID before voting. Indeed, this Amendment dictates the “General

Assembly shall enact general laws governing the requirements of such photographic

identification[.]” Id. Importantly, however, this same Amendment grants the

General Assembly the authority to “include exceptions” when enacting a voter-ID law.

Id.

 Although the General Assembly certainly had a duty, and thus a proper

justification, to enact some form of a voter-ID law, we do not believe this mandate

 11 We are cognizant of the fact neither party briefed this issue extensively and that additional
justifications for S.B. 824, such as prevention of voter fraud and inspiring confidence in elections, were
presented by the defendants in the federal district court case. See Cooper, ___ F. Supp. 3d at ___.
However, because these justifications have not been raised on appeal, we decline to consider them in
our analysis on this point. See N.C.R. App. P. 28(b)(6). We also acknowledge additional justifications
may be brought out in a subsequent trial on the merits in this case.

 - 40 -
 HOLMES V. MOORE

 Opinion of the Court

“alone can justify the legislature’s choices” when it drafted and enacted S.B. 824

specifically. McCrory, 831 F.3d at 221 (citations omitted). As detailed above, the

General Assembly’s history with voter-ID laws, the legislative history of the act, the

unusual sequence of events leading to its passage, and the disproportional impact on

African American voters likely created by S.B. 824 all point to the conclusion that

discriminatory intent remained a primary motivating factor behind S.B. 824, not the

Amendment’s directive to create a voter-ID law. This is especially true where the

Amendment itself allows for exceptions to any voter-ID law, yet the evidence shows

the General Assembly specifically left out types of IDs that African Americans

disproportionately lack. Such a choice speaks more of an intention to target African

American voters rather than a desire to comply with the newly created Amendment

in a fair and balanced manner. Accordingly, we conclude, on this Record, Defendants

have yet to show S.B. 824 would have been enacted in its current form irrespective of

any alleged underlying discriminatory intent. See id. (citation omitted). At this stage

of the proceedings, Plaintiffs have thus shown a clear likelihood of success on the

merits of their Discriminatory-Intent Claim for the voter-ID provisions of S.B. 824.

Therefore, the majority of the three-judge panel below erred by finding Plaintiffs

failed to prove a likelihood of success on the merits.

 III. Preliminary Injunction

 - 41 -
 HOLMES V. MOORE

 Opinion of the Court

 Having concluded Plaintiffs have shown a likelihood of success on the merits

of their Discriminatory-Intent Claim, we now turn to the question of whether

Plaintiffs are “likely to sustain irreparable loss unless the injunction is issued, or if,

in the opinion of the Court, issuance is necessary for the protection of [Plaintiffs’]

rights during the course of litigation.” Kennedy, 160 N.C. App. at 8, 584 S.E.2d at

333 (citation and quotation marks omitted). In undertaking this analysis, we “weigh

the equities” for and against a preliminary injunction. Redlee/SCS, Inc. v. Pieper,

153 N.C. App. 421, 427, 571 S.E.2d 8, 13 (2002).

 Plaintiffs contend they are likely to sustain irreparable harm because, inter

alia, S.B. 824 violates Plaintiffs’ constitutional right to vote on equal terms. As

discussed previously, Plaintiffs have a fundament right to participate in elections on

an equal basis. See Blankenship, 363 N.C. at 522, 681 S.E.2d at 762 (“The right to

vote is one of the most cherished rights in our system of government, enshrined in

both our Federal and State Constitutions.” (citations omitted)); see also Dunn, 405

U.S. at 336, 31 L. Ed. 2d at 280 (citations omitted). The Fourth Circuit has

recognized: “Courts routinely deem restrictions on fundamental voting rights

irreparable injury.” League of Women Voters of N.C., 769 F.3d at 247 (citations

omitted). Further, “discriminatory voting procedures in particular are the kind of

serious violation of the Constitution . . . for which courts have granted immediate

relief.” Id. (citation and quotation marks omitted). The need for immediate relief is

 - 42 -
 HOLMES V. MOORE

 Opinion of the Court

especially important in this context given the fact that “once the election occurs, there

can be no do-over and no redress. The injury to these voters is real and completely

irreparable if nothing is done to enjoin [the] law.” Id. (footnote omitted).

 With these principles in mind, we agree with Plaintiffs that absent an

injunction, Plaintiffs have shown they are likely to suffer irreparable harm. As

demonstrated supra, S.B. 824’s voter-ID requirements are likely to

disproportionately impact African American voters to their detriment. Although

Plaintiffs may still have their vote counted by utilizing the reasonable-impediment

provision, such a fact does not automatically negate the injury Plaintiffs still will

have suffered—the denial of equal treatment in voting—based on a law allegedly

motivated by discriminatory intent. See id. (citation omitted).

 In addition, enjoining the voter-ID provisions furthers “the public interest[,

which] favors permitting as many qualified voters to vote as possible.” Id.

(alterations, citation, and quotation marks omitted). Furthermore, S.B. 824 has

already been enjoined at least for the March primaries by the federal district court.

While the future of that injunction and litigation is uncertain, enjoining the law

during the litigation of this action, which the parties acknowledged would still be

ongoing after these primaries, further helps prevent voter confusion leading up to the

general election this fall and during the pendency of this litigation, which voter

confusion has a strong potential to negatively impact voter turnout. Balancing the

 - 43 -
 HOLMES V. MOORE

 Opinion of the Court

equities in this case, Plaintiffs have adequately shown they are “likely to sustain

irreparable loss unless the injunction is issued[.]” Kennedy, 160 N.C. App. at 8, 584

S.E.2d at 333 (citation and quotation marks omitted). Therefore, Plaintiffs have

shown they are entitled to a preliminary injunction enjoining the voter-ID provisions

of S.B. 824. See id. (citation omitted).

 As for the scope of this injunction, Legislative Defendants assert the injunction

should be limited solely to the individual Plaintiffs, and not statewide, because

“injunctive relief should be no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs.” Califano v. Yamasaki, 442 U.S. 682, 702, 61

L. Ed. 2d 176, 193 (1979). However, Califano also noted one of the “principles of

equity jurisprudence” is that “the scope of injunctive relief is dictated by the extent

of the violation established, not by the geographical extent of the plaintiff class.” Id.

(citation omitted). Accordingly, Califano supports the proposition that injunctive

relief should extend statewide because the alleged violation—the alleged facial

unconstitutionality of S.B. 824—impacts the entire state of North Carolina. See id.;

see also Rodgers v. Bryant, 942 F.3d 451, 458 (8th Cir. 2019) (upholding a district

court’s grant of a statewide preliminary injunction of an Arkansas anti-loitering

statute where only two individual plaintiffs brought a facial challenge to the statute

under the First Amendment). Thus, Plaintiffs have shown the need for a statewide

preliminary injunction barring Defendants from implementing or enforcing the voter-

 - 44 -
 HOLMES V. MOORE

 Opinion of the Court

ID provisions of S.B. 824 as to all North Carolina voters pending a ruling on the

merits of Plaintiffs’ facial challenge under the North Carolina Constitution.

Consequently, we reverse the trial court’s denial of Plaintiffs’ Preliminary-Injunction

Motion.

 Conclusion

 Accordingly, for the foregoing reasons, we reverse the trial court’s decision to

deny Plaintiffs’ Preliminary-Injunction Motion and remand to the trial court with

instructions to grant Plaintiff’s Motion and preliminarily enjoin Defendants from

implementing or enforcing the voter-ID provisions of S.B. 824—including,

specifically, Parts I and IV of 2018 N.C. Sess. Law 144—until this case is decided on

the merits.

 REVERSED AND REMANDED.

 Judges ARROWOOD and COLLINS concur.

 - 45 -